548 P.2d 459

Mildred I. COUILLARD, Plaintiff-Appellant,

v.

BANK OF NEW MEXICO, Defendant-Appellee.

No. 2098.

Court of Appeals of New Mexico.
March 16, 1976.

Jim D. Wiseman, Orville C. McCallister, Steven R. Fairchild, Albuquerque, for plaintiff-appellant.

Ray H. Rodey, Robert L. Schwartz, Rodey, Dickason, Sloan, Akin & Robb, P. A., Albuquerque, for defendant-appellee.

OPINION

SUTIN, Judge.

Plaintiff appeals from a directed verdict in favor of the Bank of New Mexico on the issue of punitive damages arising out of the acts and conduct of Melvin Amerson, Jr., manager of the Coronado branch and also assistant vice-president of the parent bank. We affirm.

A. *Facts Most Favorable to Plaintiff*

Amerson had been employed by the Bank of New Mexico for ten years. In 1970, he was promoted to manager of the Coronado branch, and, at about the same time, he became an assistant vice-president of the parent bank.

As branch manager, Amerson was in complete charge of personnel hiring and firing, loans and collections. His authorization covered loans up to $7,500.00. As assistant vice-president, Amerson was the highest ranking executive at the Coronado branch, and the Bank of New Mexico did not tell him how to run this branch bank. However, he did not sit on any policy making committee nor on the board of directors, nor on the senior management committee of the bank.

In June, 1971, Gordon E. Couillard, plaintiff's husband, entered into a home improvement loan agreement with the Bank of New Mexico and procured credit life insurance. The transaction was handled by Amerson at the Coronado branch.

Approximately a year later, Couillard passed away. Plaintiff asked Amerson if there was credit life insurance on the loan and he said that her husband refused to buy the insurance. Amerson requested payment of the loan. On August 3, 1972, plaintiff gave Amerson a check in the sum of $5,218.61 in payment of the loan. About six weeks to two months later she received the note, marked "paid", and put it away.

Later, while plaintiff happened to be in the bank, Amerson told her he had a surprise for her, a check for $1,088.00 which plaintiff states he said was "just pennies

from heaven. . . . It's yours and just don't ask any questions."

Thereafter, in February, 1973, plaintiff examined the note and discovered that her husband had procured credit life insurance. She approached Amerson and he told her that her husband had cancelled the insurance but he could not find the check he had given to her husband in repayment of the premium. Plaintiff was unable to contact Amerson thereafter.

Amerson had executed a cashier's check to Couillard in the sum of $206.67 which he backdated to June 3, 1971, the date the loan was made. He had typed on this check "Refund on CL Premium not used." This check remained in the file. It was a false document.

After plaintiff paid off the loan on August 3, 1972, the Bank of New Mexico filed a claim with the insurance company. Amerson held plaintiff's check until August 11, 1972, when he let the check clear plaintiff's account. On August 24, 1972 (the date the note was marked paid), Amerson learned of the insurance claim when he received payment of Couillard's loan from the insurance company.

Amerson's explanation of his wrongful conduct follows: He executed a cashier's check made payable to the Bank of New Mexico in the sum of $5,218.61, the same amount as plaintiff's check. He kept the original and a copy and sent a copy of the cashier's check to the proof department. This came out as an asset of the Bank of New Mexico.

Amerson used the cashier's check to keep three bad loans current until he could trace the people and recover the loans. As loans were made current, the balance of the cashier's check would be used to execute another cashier's check. This process continued until he exhausted the $5,218.61, and he never located the people to whom he had made bad loans. He undertook this procedure for fear of losing his job.

Plaintiff never contacted anyone else at the Bank of New Mexico concerning the status of this transaction and no one else at the bank was aware of it. The bank first knew of this transaction when it was served with a summons. Amerson was called in and told that his employment would be terminated or he could resign. No senior officer of the bank ratified, authorized or participated in the Couillard transaction.

B. *Judgments Entered*

Plaintiff's motion for partial summary judgment against the Bank of New Mexico was granted, and plaintiff was awarded judgment in the sum of $5,563.90, the principal amount prayed for plus interest, and this was paid in full.

At the close of plaintiff's case, the trial court directed a verdict for Bank of New Mexico on the issue of punitive damages because "there was no participation, ratification or authorization by the Bank of New Mexico." Judgment was entered.

After the trial of the case, judgment was entered against Amerson for punitive damages based upon a verdict of the jury.

C. *Bank of New Mexico was not subject to punitive damages.*

The sole issue on appeal is whether the tortious conduct of Amerson can give rise to an issue of fact for the jury on a claim for punitive damages against the Bank of New Mexico.

The rule is well established in New Mexico that the principal, or master, is liable for punitive or exemplary damages *only* in cases where the principal or master has in some way authorized, participated in or ratified the acts of the agent or servant, which acts were wanton, oppressive malicious, fraudulent or criminal in nature.

Cases holding liability for punitive damages are: *Galindo v. Western States Collection Company*, 82 N.M. 149, 477 P.2d 325 (Ct.App.1970); *Grandi v. LeSage*, 74 N.M. 799, 399 P.2d 285 (1965); *Bank of New Mexico v. Rice*, 78 N.M. 170, 429 P.2d 368 (1967); *Jones v. Citizens Bank of Clovis*, 58 N.M. 48, 265 P.2d 366 (1954).

Not liable for punitive damages are: *Sanchez v. Securities Acceptance Corp.,*

57 N.M. 512, 260 P.2d 703 (1953); *Miera v. George*, 55 N.M. 535, 237 P.2d 102 (1951); *Stewart v. Potter*, 44 N.M. 460, 104 P.2d 736 (1940); *Loucks v. Albuquerque National Bank*, 76 N.M. 735, 418 P.2d 191 (1966); *Fredenburgh v. Allied Van Lines, Inc.*, 79 N.M. 593, 446 P.2d 868 (1968).

However, these cases have not reached the problem with which we are confronted. None of the New Mexico cases discussed the liability of a principal for the wrongful acts of an agent or servant like Amerson who was a branch manager and an officer of a national bank. This is a matter of first impression in New Mexico.

In *Loucks v. Albuquerque National Bank*, supra, a vice-president of the bank was a party defendant involved in wrongfully dishonoring checks. The court merely said that intemperate remarks of the vice-president were not sufficient to support a claim for punitive damages. The court did not determine whether a sufficient punitive damage claim against the vice-president would be imputed to the bank.

In *Bank of New Mexico v. Rice*, supra, the Supreme Court spoke only in terms of the acts of an official of the bank, and held the bank liable for compensatory and punitive damages because the official acted maliciously toward the Rice Corporation.

In *Jones v. Citizens Bank of Clovis*, supra, the Supreme Court spoke only in terms of the acts of the bank and held the bank liable for punitive damages.

*Stewart v. Potter*, supra, is the leading case on punitive damages in New Mexico. It favored the rule observed in the case of *Lake Shore & Michigan Southern Railway Co. v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893). Plaintiff relies on dictum in that case. It reads:

The president and general manager, or, in his absence, *the vice-president in his place, actually wielding the whole executive power of the corporation*, may well be treated as so far representing the corporation and identified with it that any wanton, malicious or oppressive in-

tent of his, *in doing wrongful acts in behalf of the corporation to the injury of others, may be treated as the intent of the corporation itself* . . .. [Emphasis added] [147 U.S. at 114, 13 S.Ct. at 265].

Amerson, as vice-president of the parent bank, did not actually wield the whole executive power of the parent bank. Amerson had limited power to loan money. He had no policy making power. He was subject to the power and control of the board of directors of the parent bank. He was the highest executive officer of the branch bank. What is the relationship between a parent bank and its branch?

Bank of New Mexico is a state bank. For assistance, we turn to the definition of branch bank set forth in § 48–2–16(B), N.M.S.A.1953 (Repl.Vol. 7).

B. Branch banks shall be operated as branches of and under the name of the parent bank, and under the control and direction of the board of directors and executive officers of the parent bank.

"A branch is not a separate corporation or legal entity but is an office or agency operated by the legal entity which operates the main bank. It has no separate board of directors or capital structure, its deposits are pooled with those of the main bank, and its loan limits are based on the main bank's capital structure." *In re Application of Kenilworth State Bank*, 49 N.J. 330, 230 A.2d 377, 380 (1967).

■ A national bank "branch" is defined as "any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State . . . at which deposits are received, or checks paid, or money lent." 12 U.S.C.A. § 36(f). The purpose of the statute is to place national and state banks on a basis of competitive equality insofar as branch banking is concerned. *First National Bank v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969).

■ The term "branch" creates the relationship of principal and agent between the parent organization and the branch.

It may have a separate and distinct identity for some purposes in dealing with third persons. *Dean v. Eastern Shore Trust Co.*, 159 Md. 213, 150 A. 797 (1930); 10 Am. Jur.2d Banks § 326 (1963); 9 C.J.S. Banks and Banking § 55 (1938). But as between the parent bank and the branch, the employees of the branch are employees of the parent bank. "The action or inaction of the branch bank is the action or inaction of the parent bank." *Guaranty Bank & Trust Co. v. Town of Amite City*, 64 So.2d 502, 505 (La.App.1953). Branch bank business and policies are subject to the supervision and control of the parent bank. It is an instrumentality by which the parent bank carries on its business. *Sokoloff v. National City Bank*, 130 Misc. 66, 224 N.Y.S. 102 (1927), aff'd 223 App.Div. 754, 227 N.Y.S. 907, aff'd 250 N.Y. 69, 164 N.E. 745 (1928).

The emphasized words in *Lake Shore & Michigan Southern Railway Co.*, supra, when applied to state or national bank branches, do not support plaintiff's contention. It is clear that Amerson did not actually wield the whole executive power of the parent bank. The fact that he was the highest executive officer of the bank *at the Coronado branch* did not transshape the branch into an entity such as a parent bank. Furthermore, the wrongful acts of Amerson committed against plaintiff were not done "in behalf of the corporation to the injury of others," and we cannot say that his acts "may be treated as the intent of the corporation itself." [147 U.S. at 114, 13 S.Ct. at 265].

Plaintiff also relies on *Fredenburgh*, supra, in which the court said:

It was not shown that the agents, who perhaps acted maliciously or recklessly, were themselves to be fairly considered *executive in character,* see *Winkler v. Hartford Acc. & Indem. Co.*, 66 N.J. Super. 22, 168 A.2d 418 (1961); . . . . [Emphasis added] [79 N.M. at 598, 446 P.2d at 873].

Plaintiff contends this statement "expanded the guidelines for determining the exemplary liability of the principal". She relies on *Winkler*, cited therein. We disagree on two grounds: (1) "executive in character" has been interpreted to mean that Amerson "had no superior, was subordinate to no higher corporate officer, so that his actions were tantamount to those of the board of directors." *Petition of Den Norske Amerikalinje A/S*, 276 F.Supp. 163, 179 (U.S.D.C. Ohio 1967). This definition reaches the proportions of *Lake Shore & Michigan Shore Railway Co.*, supra, and Amerson did not fall into this category. (2) Amerson was not acting on behalf of the bank. It has been held that where an officer of the bank, or agent, acts wrongfully *on behalf of the bank*, the bank may be liable for punitive damages. *First Nat. Bank v. Stewart*, 204 Ala. 199, 85 So. 529 (1920). See, also, *Deposit Guaranty Bank & Trust Co. v. Silver Saver Stores*, 166 Miss. 882, 148 So. 367 (1933); 9 C.J.S. Banks and Banking § 365b.

Plaintiff has cited strong authority to support her position. See, *Stroud v. Denny's Restaurant, Inc.*, 532 P.2d 790 (Or. 1975). We mention this case because it does not refer to or seem to follow *Gill v. Selling*, 125 Or. 587, 267 P. 812, 58 A.L.R. 1556 (1928) cited in *Stewart v. Potter*, supra. *Stroud* says:

A majority of courts have adopted the rule that, if a servant has committed a tort within the scope of his employment so as to render the corporation liable for compensatory damages, and if the servant's act is such as to render him liable for punitive damages, then the corporation is likewise liable for punitive damages. [Citations omitted] [532 P.2d at 793].

We recognize the existence of a conflict of authority, 19 C.J.S. Corporations § 1286 b, but we can find no support for the *Stroud* rule in New Mexico, nor do we find it applicable to banking institutions.

The century old controversy in the courts over punishment of the principal or master by payment of punitive damages rests upon a philosophical concept. Should an innocent principal or master pay the penalty for failure to exercise closer control of its agents? New Mexico has said "No", following the rule that a bank shall not be punished for the fraud or tort of an officer who manages a branch bank, unless this officer represents the whole executive power of the parent bank, or the parent bank is in some way connected with the fraud or tort of the officer by authorization, participation in, or ratification thereof.

The judgment is affirmed.

IT IS SO ORDERED.

HERNANDEZ and LOPEZ, JJ., concur.