643 P.2d 263

Barbara Ellen TEMPLIN, Plaintiff-Appellant,

v.

MOUNTAIN BELL TELEPHONE COMPANY, Defendant-Appellee,

v.

John R. TOUPS, Sr., Third Party Defendant.

No. 5166.

Court of Appeals of New Mexico.

Feb. 2, 1982.

Writ of Certiorari Quashed April 1, 1982.

Jack T. Whorton, Alamogordo, for plaintiff-appellant.

H. Perry Ryon, Albuquerque, for defendant-appellee.

John R. Toups, Sr., pro se.

## OPINION

LOPEZ, Judge.

Barbara Templin appeals the grant of two summary judgments in favor of Mountain Bell. We reverse both summary judgment actions.

On July 30, 1979, John Toups, then plaintiff's husband, went to the Alamogordo office of Mountain Bell in order to have the Toups' telephone disconnected. He informed Mountain Bell that he was getting a divorce and wanted the Toups' old phone number hooked up at his new residence. Mountain Bell disconnected the phone at the Toups' house and eventually hooked the same number up in John Toups' new apartment.

Plaintiff continued to live at the Toups' old residence. She arranged with Mountain Bell to have a new phone with a new number installed in her name at the old house. She was responsible for paying the bills on this new number.

The Toups were divorced on September 7, 1979. Plaintiff took back her maiden name of Templin. It is a contested issue whether plaintiff informed Mountain Bell of her name change.

On November 1, 1979, some weeks after the divorce, John Toups called Mountain Bell and told the service representative that he was plaintiff's husband, that they wanted an off-premises extension of her phone installed in his apartment, and that he should be billed for this extension. Mountain Bell complied with the request and installed an extension of plaintiff's phone in Toups' apartment on November 5, 1979. Mountain Bell did not obtain plaintiff's consent for the off-premises extension, nor did they notify her that it had been installed.

Plaintiff immediately became suspicious that her ex-husband was listening to her phone conversations, because he repeated them to her and harassed her about the contents of her conversations. She repeatedly complained to Mountain Bell for the next two weeks. Mountain Bell checked for wiretaps and assured plaintiff that her phone was not bugged.

Finally, on November 19, 1979, plaintiff removed her telephone from her wall, took it to Mountain Bell, and told the service representative that she no longer wanted service until the interception of her calls was stopped. At that time, the service representative checked Mountain Bell's records and discovered the off-premises extension. After that, Mountain Bell disconnected the extension.

Plaintiff sued Mountain Bell for liquidated and punitive damages under § 30–12–11, N.M.S.A. 1978. Mountain Bell joined John Toups as a third-party defendant. Before trial, the district judge granted summary judgment in favor of Mountain Bell on the issue of punitive damages. After trial on the remaining issues, the jury was unable to reach a verdict. The judge granted a mistrial, and later granted summary judgment on all litigated issues.

Punitive Damages

In *Samedan Oil Corp. v. Neeld*, 91 N.M. 599, 577 P.2d 1245 (1978), the New Mexico Supreme Court stated,

It is the established law of New Mexico that punitive or exemplary damages may be awarded "only when the conduct of the wrongdoer may be said to be mali-

ciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the plaintiff's rights." *Loucks v. Albuquerque National Bank*, 76 N.M. 735, 747, 418 P.2d 191, 199 (1966).

In that case, as in this, an issue was whether the defendant corporation could be held liable for punitive damages as a result of the actions of its agent. The court quoted the rule stated in *Couillard v. Bank of New Mexico*, 89 N.M. 179, 181, 548 P.2d 459, 461 (Ct.App.1976),

"that the principal, or master, is liable for punitive or exemplary damages *only* in cases where the principal or master has in some way authorized, participated in or ratified the acts of the agent or servant. * * *"

This rule is embodied in N.M.U.J.I. Civ. 18.26, N.M.S.A. 1978 (Repl.Pamph.1980), which states,

The principal [employer] is liable for punitive or exemplary damages only when the principal [employer] has in some way authorized, participated in or ratified the acts of the agent [employee].

In *Samedan*, the district production foreman designed and ordered the installation of a defective safety vent system on a gas well. The decedent was killed as a result of the malfunctioning of the safety vent system. The jury awarded punitive damages against the corporation. The Supreme Court reversed the award of punitive damages and remanded the case to the trial court, because the jury instructions given by the trial court did not accurately inform the jury of applicable New Mexico law on punitive damages against a principal.

In *Couillard*, a branch manager of the Bank of New Mexico defrauded a customer. The trial court granted the Bank of New Mexico a directed verdict on the issue of punitive damages. On appeal, this court affirmed the action of the trial court, because the bank manager did not represent "the whole executive power of the parent bank," and the parent bank did not authorize, participate in or ratify the fraud.

In our case, on motion for summary judgment, Mountain Bell presented affidavits from the business office supervisor and the manager of the resident services, stating that neither they nor any higher level of management in the corporation had authorized the installation of the off-premises extension in John Toups' apartment. This evidence indicates that the Alamogordo employees did not receive express authorization from the various levels of management of Mountain Bell specifically to install an extension of Barbara Templin's telephone in John Toups' apartment. However, this does not settle the question of authorization. Attached to the affidavit of the manager of residential services in Alamogordo, was a copy of a company regulation promulgated by J. E. Killorin, Vice President and New Mexico General Manager for Mountain Bell. Such general regulation authorized company personnel to install additional service or equipment upon request of applicants. In addition, in plaintiff's response to defendant's motion for partial summary judgment, plaintiff offered the deposition of Stanley Lee, an installer repairman for Mountain Bell in opposition to the summary judgment motion. The installer repairman was the person who installed the off-premises extension which gave rise to this litigation. In his deposition, Lee testified that he was instructed to install such extension by the telephone company dispatcher from Mountain Bell's Office in Roswell. Attached as an exhibit to such deposition was a telephone company daily work sheet given to the workman as his work assignment which read in part:

WORK SHEET

INSTALLER  I Lee  EXCHANGE  Alamo

FIELD  SUPERVISOR  Greco  DATE 11–5–79

■ Summary judgment is a drastic remedy to be used with great caution. *Pharmaseal Laboratories, Inc. v. Goffe*, 90 N.M. 753, 568 P.2d 589 (1977). *Zengerle v. Commonwealth Ins. Co.*, 60 N.M. 379, 291 P.2d 1099 (1955). Summary judgment is improper, if, after resolving all reasonable doubts in favor of the opponent of the motion, the evidence adduced by pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there was a genuine issue as to any material fact. *Pharmaseal Laboratories, Inc. v. Goffe, supra.* Summary judgment should not be employed where there is the slightest doubt as to the existence of material fact, and if equally logical but conflicting inferences can be drawn from the facts, summary judgment is not proper. *Fischer v. Mascarenas*, 93 N.M. 199, 598 P.2d 1159 (1979).

■ We conclude that a genuine issue of material fact existed as to whether Mountain Bell through the general policies of the corporation, authorized the procedures permitting installation of the extension and whether the supervisory personnel authorized the extension in question. That an issue of material fact existed as to whether Mountain Bell gave authorization for the extension was made clear by the testimony, at trial, of the business office supervisor, the manager of the resident services, and the district manager.

The business office supervisor testified:

Q. Do you think there was any mistake made anywhere in there by Lisa [the service representative who took John Toups' order for the off-premises extension] or anyone in giving John Toups this extension on Barbara Templin's number? Do you see a mistake in company procedure anywhere?

A. As far as determining if the off-premises extension should go in?

Q. As far as being issued, from your point of view. Not what Toups may have encouraged you to do, but from your point of view, do you see any mistakes in there by any of the people working under you in the way they approached this?

A. As far as putting in the extension, no, sir, I do not. As far as determining if he was indeed, a party we should be taking a application from,

no, I do not see any error or breakdown in that.

\* \* \* \* \* \*

Q. Have procedures changed locally here as a result of anything you have done or Mr. Antram [manager of resident services] has done or Mr. Bayes [district manager] has instructed you to do, or have you been instructed to up the line? Have your procedures changed any as a result of this matter having happened?

A. In determining if an extension should go in?

Q. Yes.

A. No, sir.

Q. So, what is true then is true now?

A. Yes, sir.

The manager of resident services, who supervises the business office supervisor, confirmed the above statements:

Q. [A]s a general policy then, how was it in this case that an off-premises extension was granted to Mr. Toups when he called in?

A. Well, Mr. Toups called in and naturally had the same last name. In this case, Mr. Toups offered information to us of why they wanted the extension at the Alamo Apartments, the fact that Barbara Templin has been working with this Newcomer's Guide and needed the phone at the other house, and that the son would be staying at 1338 McKinley, and he and Barbara would be staying at the Alamo Apartments, sounded believable to the service representative, so she proceeded.

Q. Okay, Do you feel she was acting just in the normal course of business, or do you feel she was doing something improper?

A. I think she acted according to our policies and tariffs, yes, sir.

Q. Okay. And are our policies that we will give order activity based on a verbal order from a customer?

A. Yes, they are.

Q. And is that reflected in the tariffs which have been filed with the State Corporation Commission?

A. Yes, they are.

The district supervisor, who supervises the manager of resident services, also testified:

Q. Have you in the course of your employment had an opportunity to become familiar with the policies of Mountain Bell regarding the circumstances under which an off-premise extension will be placed?

A. Yes, sir.

Q. Could you relate what those policies are in your own words with respect to under what circumstances an off-premise extension will be hooked up on request of the customer?

A. Our policy is that if a request is received for an off-premise extension, whether it be verbal or face-to-face or over the phone, that if it appears that there is nothing wrong with the request, then it will be granted, the extension will be installed.

\* \* \* \* \* \*

Q. The tariff that we have looked at here by the Vice-President and General Manager of New Mexico was promulgated by a corporate authority, as you say. He is the Chief Executive Officer in New Mexico, is he not?

A. Yes, sir.

Q. And his statements in the sense of that tariff are statements of corporate authority; is that correct?

A. Yes, sir.

Q. And the actions we have heard described during this trial in terms of what you have just said were actions taken in a manner that you say is consistent with corporate authority?

A. Yes, sir.

Q. The taking of the, specifically, the taking of the order by John Toups to attach a telephone extension in his apartment so that he has access to

Barbara Toups' telephone number, at least, was procedurally correct in the manner in which it was accomplished under the tariffs and under the corporate policy we have talked about, to be more specific?

A. With the understanding the service representative had of this situation, yes, sir.

This testimony indicates that there is a material issue of fact whether Mountain Bell, through its policies and tariffs, authorized the actions of its Alamogordo employees in this matter. The summary judgment on punitive damages is reversed. Liability of Mountain Bell under § 30–12–11.

Section 30–12–11, N.M.S.A. 1978, states:
A. Any person whose wire or oral communication is intercepted, disclosed or used in violation of this act [30–12–1 to 30–12–11 NMSA 1978] shall;

(1) have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose or use such communications; and

(2) be entitled to recover from any such person actual damages, but not less than liquidated damages computed at the rate of one hundred dollars ($100) for each day of violation or one thousand dollars ($1000), whichever is higher; punitive damages; and reasonable attorney's fee and other litigation costs reasonably incurred.

B. A good faith reliance on a court order or on the provisions of this act shall constitute a complete defense to any civil or criminal action.

C. Any communications common carrier which in good faith acts in reliance upon a court order or in compliance with any of the provisions of this act shall not be liable for any civil or criminal action.

Both at trial and on appeal, the issue of Mountain Bell's civil liability was framed so that plaintiff had to prove that Mountain Bell had violated § 30–12–1, N.M.S.A. 1978 (Supp.1981), the criminal statute prohibiting interference with communications,[1] in order to qualify for civil damages under § 30–12–11. Whether or not Mountain Bell is guilty of a violation of § 30–12–1 cannot be determined in a civil trial; that can only be determined in a criminal prosecution of Mountain Bell by the state. Section 30–12–11 provides a civil cause of action against "any person who intercepts, discloses or uses, or procures any other person to intercept, disclose or use such communications,"

---

1. § 30–12–1. Interference with communications; exception.

Interference with communications consists of knowingly and without lawful authority:

A. displacing, removing, injuring or destroying any radio station, television tower, antenna or cable, telegraph or telephone line, wire, cable, pole or conduit belonging to another, or the material or property appurtenant thereto;

B. cutting, breaking, tapping or making any connection with any telegraph or telephone line, wire, cable or instrument belonging to or in the lawful possession or control of another, without the consent of such person owning, possessing or controlling such property;

C. reading, interrupting, taking or copying any message, communication or report intended for another by telegraph or telephone without the consent of a sender or intended recipient thereof;

D. preventing, obstructing or delaying the sending, transmitting, conveying or delivering in this state of any message, communication or report by or through telegraph or telephone; or

E. using any apparatus to do or cause to be done any of the acts hereinbefore mentioned or to aid, agree with, comply or conspire with any person to do or permit or cause to be done, any of the acts hereinbefore mentioned.

Whoever commits interference with communications is guilty of a misdemeanor, unless such interference with communications is done:

(1) under a court order as provided in Sections 30–12–2 through 30–12–11 NMSA 1978; or

(2) by an operator of a switchboard or an officer, employee or agent of any communication common carrier in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his services or to the protection of rights or property of the carrier of such communication; or

(3) by a person acting under color of law in the investigation of a crime, where such person is a party to the communication, or one of the parties to the communication has given prior consent to such interception, monitoring or recording of such communication.

without lawful authority to do so, regardless of whether that person has been convicted under § 30–12–1. One section does not depend on the other for its applicability.

New Mexico appellate courts have not ruled on the meaning of "interception" of a communication under this statute. Some federal courts have defined "interception" as set out in 18 U.S.C. § 2520, which is almost identical to § 30–12–11. These courts have not limited a cause of action under § 2520 to persons who have literally listened to or taped communications; to the contrary, they have construed the statute to include persons who were instrumental in setting up or causing the interception, even though they did not actually receive the communications. *Jacobson v. Rose*, 592 F.2d 515 (9th Cir. 1978); *White v. Weiss*, 535 F.2d 1067 (8th Cir. 1976); *Gerrard v. Blackman*, 401 F.Supp. 1189 (N.D.Ill.1975). In like manner, we construe the meaning of "any person who intercepts" to include persons who have participated in the steps necessary to effectuate an unauthorized interception of communications which results in the violation of an individual's privacy.

■ Federal and state legislation governing interception of communications demonstrates governmental interest in protecting citizens' rights to private telephone communications. Mountain Bell, due to the nature of the services it provides to the public, must take steps to protect the privacy of its customers. The facts in this case indicate that Mountain Bell made absolutely no attempt to determine whether plaintiff consented to the off-premises extension of her phone, or to inform her of the extension. If John Toups had not tipped anyone off to his interception of plaintiff's calls, and if plaintiff had not continued to complain to Mountain Bell, there is no reason to think that Mountain Bell would have disconnected the unauthorized extension. We have cited testimony from Mountain Bell managerial employees, that the actions of its employees in this case was, and is, standard acceptable procedure. The provisions of §§ 30–12–1 to 30–12–11 make it clear that corporations as well as individuals may be liable in dam-

ages if they participate in setting up unauthorized interceptions of a customer's telephone communications. Mountain Bell has a duty to obtain the valid consent of a customer before placing an extension of the customer's phone in another person's residence. This is not too great a burden for Mountain Bell to bear, when balanced against the actual and potential misuse that their current procedures allow.

We note that the trial judge's grant of the summary judgment on the issue of Mountain Bell's liability under § 30–12–11 was unusual in that it occurred after a trial and jury deliberation. However, it was not improper for the trial judge, as long as the district court retained jurisdiction of the case, to determine that there were no genuine issues as to any material fact and to grant summary judgment.

There are genuine issues of material fact as to Mountain Bell's liability for damages under § 30–12–11. The grant of summary judgment on this issue is reversed.

IT IS SO ORDERED.

DONNELLY, J., concurs.

SUTIN, Judge (dissenting in part and concurring in part).

I dissent on reversal of the partial summary judgment. I concur in the result on reversal of summary judgment.

### A. *Partial summary judgment on punitive damages must be affirmed.*

A discussion of this point requires the dexterity of Houdini and the wisdom of Solomon. It is essential to avoid an erroneous innovation in the law of summary judgment.

On August 14, 1980, plaintiff filed a verified claim for damages. The complaint was verified on information and belief and does not constitute an affidavit. *Rekart v. Safeway Stores, Inc.*, 81 N.M. 491, 468 P.2d 892 (Ct.App.1970). Plaintiff also sought judgment for punitive damages.

On February 10, 1981, defendant filed a motion for partial summary judgment on

plaintiff's claim for punitive damages. Two affidavits were filed in support of the motion.

On February 17, 1981, plaintiff filed a response. It stated that plaintiff would produce the following evidence:

1. The verified complaint and the admissions contained in the answer of defendant.

2. The interrogatories of plaintiff [there were no answers].

3. Seven depositions listed by name and "Those additional depositions taken between time of the filing of this response *and the time of the hearing.*" [Emphasis added.]

Defendant's Answer Brief states:

*The motion was granted at the close of the hearing on February 23, 1981,* and on April 20, 1981, the Partial Summary Judgment was entered.

If a record was made on February 23, 1981, the day before the trial began, neither party requested it. We must assume that something took place before the day of trial, and the court sustained defendant's motion for partial summary judgment.

The majority opinion states:

*Before trial,* the district judge granted summary judgment in favor of Mountain Bell on the issue of punitive damages.

This ruling is established by the fact that punitive damage was not submitted to the jury. Plaintiff requested three jury instructions on punitive damages which were refused. The court instructed the jury on liquidated damages. The issue of punitive damages was not before the jury.

Nevertheless, the majority opinion quoted extensively from testimony given at the trial to reverse the partial summary judgment. It states:

This testimony indicates that there is a material issue of fact whether Mountain Bell, through its policies and tariffs, authorized the actions of its Alamogordo employees in this matter. The summary judgment on punitive damages is reversed.

No authority is cited for the proposition that testimony given *at trial* can be used to reverse a partial summary judgment granted *before trial.* No authority can be cited because it would efface the meaning of summary judgment.

Inasmuch as the record, if any, which took place on February 23, 1981, is not before us, we do not know whether plaintiff produced any evidence. But if we assume that plaintiff produced the items specified in the response, plaintiff failed in the burden of establishing a genuine issue of material fact.

The partial summary judgment should be affirmed.

B. *The trial court erred in granting summary judgment after a mistrial.*

When the jury could not reach a verdict, the trial court declared a mistrial. Although it does not appear of record, defendant states in its Answer Brief:

On March 6, 1981, Mountain Bell filed a Motion for a Directed Verdict.

A motion for summary judgment was not made. Nevertheless on May 1, 1981, the trial court granted summary judgment. This is another erroneous innovation of trial procedure.

The majority opinion states:

We note that the trial judge's grant of the summary judgment * * * was unusual in that it occurred after a trial and jury deliberation. However, it was not improper for the trial judge, as long as the district court retained jurisdiction * * to determine that there were no genuine issues as to any material fact and to grant summary judgment.

The trial court only found "that the Motion for Summary Judgment [which motion was not made] should be granted." Summary judgment was granted on evidence produced at trial.

Because a district court has jurisdiction of a case does not mean that the court can avoid reversible error. Jurisdiction is the power to hear and determine a cause. When a mistrial was declared, jurisdiction

remained at rest until called into action by someone. It cannot by its own action institute a proceeding sua sponte. *Rutherford v. Buhler*, 89 N.M. 594, 555 P.2d 715 (Ct. App.1976). Without a motion for summary judgment before the court, it lacks jurisdiction to dismiss plaintiff's complaint with prejudice for no reason at all.

*Grooms v. Zander*, 246 S.C. 512, 144 S.E.2d 909, 910 (1965) said:

A mistrial is the equivalent of no trial and leaves the cause pending in the circuit court. When the trial of the case was thus terminated, the status of the litigation and of the parties became the same as though no trial had taken place. * * *

\* \* \* \* \* \*

The cause simply remained on the calendar for trial before another judge and jury on such evidence as the parties might then have available and see fit to present.

The motion for a directed verdict could not be granted after the termination of the trial for the obvious reason that there was no jury to which an instruction for the defendant could have been given. Therefore, the request that defendant's rights under the motion be preserved was nugatory.

As a general principle, when a mistrial is granted, the whole proceedings are vitiated. *Ferino v. Palmer*, 133 Conn. 463, 52 A.2d 433 (1947). There is no legal distinction between a "mistrial" and a "new trial." *Meyer v. State*, 372 S.W.2d 764 (Tex.Civ. App.1963).

The plaintiff is entitled to a new trial. Upon this basis, the summary judgment granted defendant must be reversed.