No. 67,591

BARRY L. SMITH, Administrator of the Estate of Glen C. Smith, deceased, *et al.*, *Appellants/Cross-Appellees*, v. ALBERT PRINT-UP AND AMERICAN RED BALL TRANSIT COMPANY, INC., *Appellees/Cross-Appellants*, and SOUTHWEST MOVERS, INC., AMERICAN STATES INSURANCE CO., and HARTFORD ACCIDENT & INDEMNITY CO., *Appellees*, and KANSAS TURNPIKE AUTHORITY; MYERS CONSTRUCTION COMPANY; AND ALLIED LABORATORIES, *Defendants*.

(866 P.2d 985)

Opinion filed December 30, 1993.

*Randall E. Fisher,* of Michaud, Hutton & Bradshaw, of Wichita, argued the cause and was on the briefs for appellants/cross-appellees.

*Dennis D. Webb,* of Shultz, Webb & Lonker, of Wichita, argued the cause and was on the briefs for appellee/cross-appellant Albert Printup.

*Stephen M. Kerwick*, of Foulston & Siefkin, of Wichita, argued the cause, and *Jay F. Fowler* and *Craig W. West*, of the same firm, were with him on the briefs for appellee/cross-appellant American Red Ball Transit Company, Inc.

*Vince P. Wheeler*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Randy J. Troutt*, of the same firm, was with him on the briefs for appellees Southwest Movers, Inc., and American States Insurance Co.

*Philip L. Bowman, Michael T. Metcalf,* and *Teresa J. James*, of Adams, Jones, Robinson & Malone, Chartered, of Wichita, were on the brief for appellee Hartford Accident and Indemnity Co.

*Robert E. Keeshan*, of Hamilton, Peterson, Tipton & Keeshan, of Topeka, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

DAVIS, J.: This appeal arises out of a punitive damage award in a wrongful death and survivor action. None of the issues involve the award of compensatory damages.

The facts giving rise to the cause of action are as follows.

Near midnight on September 15, 1987, defendant Albert Printup was driving a moving van southeast in the right lane on the Kansas Turnpike near the Andover exit. He lost control of the van, jackknifed, crossed the median, and collided with a pickup truck operated by Carolyn S. Elliott. Glen C. Smith was a passenger in the pickup driven by Ms. Elliott. As a result of the collision, Ms. Elliott died instantly. Mr. Smith suffered massive chest and other severe injuries but had a pulse and was breathing and groaning after impact. He died at the scene. Albert Printup survived.

Albert Printup was employed by Southwest Movers, Inc. (Southwest). He was paid a flat salary, with no bonuses for extra hours or miles. At the time of the accident, he had been "leased out" to American Red Ball Transit Company, Inc., (Red Ball) for the last four to five years. He had not driven for anyone else during that period of time. Red Ball dispatched him, and he turned in his shipping documents and driving logs to Red Ball. He turned in his expense receipts to Southwest for reimbursement.

Plaintiffs sued Printup, Southwest, and Red Ball for wrongful death and, with respect to Mr. Smith, for pain and suffering.

The court allowed the Smith plaintiffs to amend their complaint to seek punitive damages in accordance with K.S.A. 1992 Supp. 60-3703 against Southwest, Printup, and Red Ball in conjunction with their survivor action. The court ruled that punitive damages were not recoverable in the wrongful death actions.

From the very beginning, plaintiffs challenged the constitutionality of K.S.A. 1992 Supp. 60-3701. The trial court rejected this contention and found the statute to be constitutional. On summary judgment, the trial court rejected plaintiffs' claim that they were entitled to punitive damages based on the allegation that Southwest and Red Ball negligently hired, retained, supervised, and trained Albert Printup. The court allowed Smith to present punitive damage claims against the corporate defendants, but, in accordance with K.S.A. 1992 Supp. 60-3701(d)(1), only to the extent that the corporate defendants authorized or ratified Printup's conduct. The jury determined that punitive damages should be awarded against Printup and Red Ball, but not against Southwest. The court awarded punitive damages in the amount of $20,000 against Printup and $100,000 against Red Ball.

This was a long and hard-fought case. The record on appeal is voluminous. In addition to the parties' briefs, the Kansas Trial Lawyers Association has filed an *amicus curiae* brief. Most issues raised are questions of law not dependent upon the facts. Some issues, however, are fact sensitive, and, to the extent necessary, those facts will be discussed in the opinion so that the reader may better understand our decision.

Plaintiffs raise 11 separate issues; Printup raises two issues in his cross-appeal; and Red Ball raises one issue in its cross-appeal. All issues center upon the court's award of punitive damages. No party has appealed the jury verdict awarding compensatory damages.

Plaintiffs raise the following issues:

1. Is K.S.A. 1992 Supp. 60-3701 unconstitutional because it violates the right to a jury trial, the right to due process, and/or the right to equal protection?

2. Did the trial court err in holding that Elliott's heirs could not bring a punitive damage claim under the wrongful death statute?

3. Did the trial court err in limiting plaintiffs' theories of recovery by prohibiting plaintiffs from asserting an independent claim against Red Ball and Southwest for negligent hiring, training, supervision, or retention of Printup?

4. Did the trial court err in excluding evidence about Red Ball's operations before November 8, 1984, and in limiting evidence about Red Ball's safety program and other Red Ball drivers' conduct?

5. Did the trial court err in excluding evidence about Southwest's recordkeeping practices and the qualifications and conduct of other Southwest drivers?

6. Did the trial court err in instructing the jury about what conduct by Red Ball or Southwest amounted to ratification or authorization of Printup's conduct?

7. Did the trial court err in refusing to require Red Ball to produce certain financial and parent company information for use in the post-trial proceedings to determine the amount of punitive damages?

8. Did the trial court err during the post-trial proceedings by admitting evidence of post-accident conduct to mitigate punitive damages and by admitting contents of settlement negotiations?

9. Did the trial court err in refusing to hold Red Ball jointly and severally liable for the punitive damage award assessed against Printup?

10. Did the trial court err in refusing to assess treble damages against Printup and Red Ball as part of the punitive damage award?

11. Did the trial court abuse its discretion in determining the amount of punitive damages?

In his cross-appeal, Printup raises the following issues:

1. Did the trial court err in submitting to the jury Smith's claim of pain and suffering?

2. Did the trial court err in submitting to the jury Smith's claim that Printup's conduct was wanton?

Finally, Red Ball contends in its cross-appeal that the court erred by allowing punitive damages on the jury's single finding that Red Ball ratified Printup's conduct when no post-accident conduct was shown.

## (1) IS K.S.A 1992 SUPP. 60-3701(a) UNCONSTITUTIONAL?

As a preliminary matter, we note that K.S.A. 1992 Supp. 60-3701 applies only to causes of action accruing on or after July 1, 1987, and before July 1, 1988. K.S.A. 1992 Supp. 60-3701(i). Language identical to the language plaintiffs challenge, however, is included in K.S.A. 1992 Supp. 60-3702, which applies to causes of action accruing on or after July 1, 1988. K.S.A. 1992 Supp. 60-3702(h). Our holding, therefore, applies equally to 60-3702.

Plaintiffs contend that the following provisions of K.S.A. 1992 Supp. 60-3701(a) render the statute unconstitutional:

"In any civil action in which exemplary or punitive damages are recoverable, the trier of fact shall determine, concurrent with all other issues presented, whether such damages shall be allowed. *If such damages are allowed, a separate proceeding shall be conducted by the court to determine the amount of such damages to be awarded.*" (Emphasis added.)

Plaintiffs argue that at common law, the jury, not the court, determined the amount of punitive damages. They argue that legislative action requiring the court to determine the amount of punitive damages violates their rights to equal protection guaranteed by the Fourteenth Amendment of the United States Constitution, substantially impairs their rights to trial by jury guaranteed by § 5 of the Bill of Rights of the Kansas Constitution, and denies them due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

### A. Right to Equal Protection

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Appellants argue that 60-3701 violates equal protection because it treats tort victims seeking punitive damages differently than it treats other tort victims.

Equal protection becomes an issue when legislation treats "arguably indistinguishable" classes of people differently. See, *e.g.*, *Ross v. Moffit*, 417 U.S. 600, 609, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974). K.S.A. 1992 Supp. 60-3701 treats all tort victims seeking punitive damages equally. Such tort victims are "arguably indistinguishable" from one another, but are distinguishable from other tort victims. By allowing recovery of punitive damages in

certain cases, the law always has treated the victims of particularly egregious conduct differently from other tort victims. K.S.A. 1992 Supp. 60-3701 does not create a classification that results in disparate treatment of similarly situated individuals. Its application does not violate the Equal Protection Clause of the United States Constitution.

B. Right to Trial by Jury

Plaintiffs also argue that 60-3701 violates their right to trial by jury because it requires that the court determine the amount of punitive damages to be awarded. More specifically, plaintiffs claim that because punitive damages were determined by a jury at common law, the Kansas Constitution guarantees a jury determination of the amount of punitive damages. Section 5 of the Bill of Rights of the Kansas Constitution provides: "The right of trial by jury shall be inviolate."

In response to this argument, Red Ball argues that there is no vested right to punitive damages, and therefore there is no constitutional right to a jury determination of the amount of punitive damages. Southwest argues that the lack of a right to punitive damages, coupled with the nature and purpose of punitive damages, permits legislative modification of the procedure by which the amount of punitive damages is determined.

As with most meritorious issues, there is an element of truth in each of the parties' conflicting contentions. Punitive damages are not awarded to a plaintiff as a matter of right, and punitive damages were available at common law subject to the jury's determination in a proper case.

As early as 1888, the Kansas Supreme Court held that punitive damages are

"not given upon any theory that the plaintiff has any just right to recover them, but are given only upon the theory that the defendant deserves punishment for his wrongful acts, and that it is proper for the public to impose them upon the defendant as punishment for such wrongful acts in the private action brought by the plaintiff for the recovery of the real and actual damages suffered by him." *Schippel v. Norton*, 38 Kan. 567, 572, 16 Pac. 804 (1888).

A claim for punitive damages is not a "cause of action" triable to a jury; a punitive damage award is incident to and dependent upon the recovery of actual damages. *Schippel* notes:

"Where no actual damage is suffered, surely no exemplary damages can be allowed. Exemplary damages can never constitute the basis of a cause of action. They are never more than incidents to some action for real and substantial damages suffered by the plaintiff; and when given they are given only in addition to the real and actual damages suffered and recovered by him. . . . No right of action for exemplary damages, however, is ever given to any private individual who has suffered no real or actual damages. He has no right to maintain an action merely to inflict punishment upon some supposed wrongdoer. If he has no cause of action independent of a supposed right to recover exemplary damages, he has no cause of action at all." 38 Kan. at 572.

At common law and today, a claim for punitive damages exists only incidental and subject to a cause of action for actual damages. See *Moore v. State Bank of Burden*, 240 Kan. 382, 390, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987).

Although no right to punitive damages exists, punitive damages were available at common law. As early as 1864, this court made it clear that the availability of punitive damages had long been recognized in law. In *Malone v. Murphy*, 2 Kan. 250, 262 (1864), the court said:

"We would rather adopt the compensatory theory, believing it to be more nearly logically correct; but the other having been long established, recognized and acted upon by enlightened Courts, we are not disposed to change it where a change would make no difference in the results."

The availability of punitive damages continued in early decisions of this court. See *L. & G. Rld. Co. v. Rice*, 10 Kan. *426, Syl. ¶ 3 (1872); *Wiley v. Keokuk*, 6 Kan. 94, 106-07 (1870). Exemplary damages are available today in various tort actions "involving circumstances or ingredients of malice, fraud, oppression or willful and wanton disregard of another's rights." Note, *Survey of Tort Damages*, 14 Washburn L. J. 466, 472 (1975).

In those early cases cited above, the jury determined the amount of punitive damages. See *Rice*, 10 Kan. *426, Syl. § 3; *Wiley*, 6 Kan. at 106; *Malone*, 2 Kan. at 257. So it remained until the legislature enacted what is now K.S.A. 1992 Supp. 60-3701. Perhaps the most definitive statement of a jury's role prior to the adoption of 60-3701 is set forth in *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 76, 755 P.2d 1319 (1988):

"A plaintiff has no right to punitive damages except when awarded by the jury under the common law. Whether to award punitive damages and

in what amount is for the jury to determine. When awarded, punitive damages are reviewed by the trial judge if requested by post-trial motion. . . . The award of punitive damages will not be set aside unless the trial judge finds that the award (1) was based on passion, prejudice, or bias; (2) was based on mistake of law or fact; or (3) lacked evidentiary support."

Thus, at common law, punitive damages were available, and the jury determined whether such damages were to be awarded and, if so, the amount to be awarded.

In *Craig v. Hamilton*, 213 Kan. 665, 670, 518 P.2d 539 (1974), we said that "[a] litigant's right to a jury trial guaranteed by Section 5 of the Bill of Rights of the Constitution of the State of Kansas refers to that right as it existed at common law." More recently, in *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 342, 757 P.2d 251 (1988), we noted that " '[t]rial by jury is guaranteed only in those cases where the right existed at common law.' " As discussed above, juries historically have determined the amount of punitive damages in Kansas. The question we must resolve, however, is whether the fact that juries historically have determined the amount of punitive damages rises to the level of a right that existed at common law.

There is no question in Kansas that the right to trial by jury includes the right to have a jury determine actual damages. See *Malpractice Victims*, 243 Kan. at 342-43. The basis for this finding is twofold. First, the amount of damages is a fact question, and juries traditionally decide issues of fact. Second, the availability of damages distinguishes the suit at law from one in equity, and suits at law were tried to a jury at common law. Thus, the court has reasoned that it would be illogical to try a case to a jury because damages are sought, but not allow the jury to determine the amount of damages. 243 Kan. at 343.

The above reasoning does not require a jury determination of the amount of punitive damages. We must look to the character of the claim to determine whether it is one for which a right to trial by jury exists. In *Estey v. Holdren*, 126 Kan. 385, 387, 267 Pac. 1098 (1928), this court said:

"The substance of the pleadings, not the label designated by the pleader, determines the character of an action. [Citations omitted.] When a cause [of action] is properly justiciable before a jury such a trial may not be denied without the assent of parties. [Citations omitted.]"

In *Nusz v. Nusz*, 155 Kan. 699, 701, 127 P.2d 441 (1942), the Supreme Court stated: "The issues raised by the pleadings determine the nature of an action, and where the issue is essentially one justiciable at common law a jury trial may be demanded as a matter of right."

Although the amount of punitive damages may be regarded as a fact question, punitive damages are different from compensatory damages. Compensatory damages are the subject of yet another constitutional right. Section 18 of the Kansas Bill of Rights guarantees a "remedy by due course of law, and justice administered without delay." Compensatory damages fall into the category of a remedy at common law. As noted above, however, punitive damages were not considered a remedy at common law, but merely incident to those causes of action in tort requesting compensatory damages. We do not regard punitive damages as compensatory in any way, *Brewer v. Home-Stake Production Co.*, 200 Kan. 96, Syl. ¶ 1, 434 P.2d 828 (1967), and there is no right to punitive damages. *Schippel*, 38 Kan. at 572. Punitive damages are not awarded because of any special merit in the plaintiff's case. *Nordstrom v. Miller*, 227 Kan. 59, Syl. ¶ 12, 605 P.2d 545 (1980). The express purpose of punitive damages is and has been to punish the tortfeasor and to deter it and others from committing similar wrongs in the future. *Folks*, 243 Kan. 57, Syl. ¶ 6; *Nordstrom*, 227 Kan. 59, Syl. ¶ 12; *Wiley*, 6 Kan. at 107. No separate right of action existed at common law for punitive damages. *Schippel*, 38 Kan. at 572.

Indeed, while the availability of actual damages distinguishes legal from equitable actions and, thus, historically determined when a jury trial was available, punitive damages may be regarded as equitable in nature. In *Digital & Analog v. North Supply*, 63 Ohio St. 3d 657, 590 N.E.2d 737 (1992), the Ohio Supreme Court determined that a plaintiff was not entitled to a jury determination of the amount of attorney fees. The court's analysis of this issue is instructive. The court determined that it was "wholly appropriate to treat attorney fees in the same manner as punitive damages with respect to whether such an issue is to be presented to a jury." 63 Ohio St. 3d at 662. The Ohio court found that an award of attorney fees is "a punitive (and thus equitable) remedy."

63 Ohio St. 3d at 662. In Ohio, as in Kansas, the right to jury trial does not exist if the relief sought is equitable in nature. 63 Ohio St. 3d at 662.

Given the character of a claim for punitive damages, the fact that juries historically determined punitive damages at common law does not establish that such determination was a right at common law. Because a plaintiff does not have a right to punitive damages, the legislature could, without infringing upon a plaintiff's basic constitutional rights, abolish punitive damages. If the legislature may abolish punitive damages, then it also may, without impinging upon the right to trial by jury, accomplish anything short of that, such as requiring the court to determine the amount of punitive damages or capping the amount of the punitive damages.

We have reviewed other jurisdictions to determine how courts have addressed the constitutionality of statutes that restrict the availability of punitive damages or require a portion of the punitive damages award to be paid into a state fund. Eight states require payment of some portion of punitive damages award to the state or state-sponsored funds. These states are:

1. Colorado (Colo. Rev. Stat. § 13-21-102[4] [1987])
2. Florida (Fla. Stat. § 768.73[2][b] [1993 Supp.])
3. Georgia (Ga. Code Ann. § 51-12-5.1[e][2] [1993 Supp.])
4. Iowa (Iowa Code § 668A.1[2][b] [1993])
5. Missouri (Mo. Rev. Stat. § 537.675[2] [1992 Supp.])
6. New York (N.Y. Civ. Prac. L. & R. § 8701 [McKinney 1993 Supp.])
7. Oregon (Or. Rev. Stat. § 18.540[1] [1991])
8. Utah (Utah Code Ann. § 78-18-1[3] [1992])

Of the four states that have addressed the constitutionality of such provisions, two have held such statutes to be unconstitutional and two have held the statutes to be constitutional.

In *Kirk v. Denver Pub. Co.*, 818 P.2d 262 (Colo. 1991), the Colorado Supreme Court held that a statute requiring payment of one-third of the punitive damage judgment to the state general fund was an unconstitutional taking of private property without just compensation. The basis of this opinion, however, is not helpful in an analysis of the question we have before us because

the court's decision is based upon the existence of a judgment creating a property interest deserving constitutional protection. The court held that the provisions of Colo. Rev. Stat. § 13-21-102(4), requiring payment of one-third of a punitive damage judgment to the state general fund, violated the federal and state constitutional proscriptions against the taking of private property without just compensation because the statute allowed the taking of a judgment creditor's property interest in the judgment without any constitutionally permissible government interest. 818 P.2d at 264.

The United States District Court for the Middle District of Georgia held unconstitutional two provisions of Georgia's tort reform statute: (1) Ga. Code Ann. § 51-12-5.1(e)(1), which allowed only one punitive damage award against a product liability defendant, regardless of the number of causes of action that may arise from the liability, and (2) Ga. Code Ann. § 51-12-5.1(e)(2), which required payment to the state treasury of 75% of a punitive damage award in a product liability case, less a proportionate share of litigation costs. *McBride v. General Motors Corp.*, 737 F. Supp. 1563 (M.D. Ga. 1990).

The court found both provisions unconstitutional on their faces because they impermissibly discriminated against product liability plaintiffs. 737 F. Supp. at 1569. The court specifically found that the Georgia statute violated equal protection because there was no rational basis for the statute's disparate treatment of product liability plaintiffs. 737 F. Supp. at 1578.

Unlike the Georgia provisions at issue in *McBride*, which applied only to product liability plaintiffs, Kansas does not create an impermissible classification of tort victims.

In *Gordon v. State*, 585 So. 2d 1033 (Fla. App. 1991), a Florida appellate court upheld the constitutionality of Fla. Stat. § 768.73(2)(b), which, at the time, required payment of 60% of the punitive damage award to the state General Revenue Fund or Public Medical Assistance Trust Fund, depending on the type of cause of action. The Florida court found that there was no unconstitutional taking of property without due process because a plaintiff had no protectable right to recover punitive damages. Additionally, the court concluded that there was no violation of a substantive due process right because the statute had a rational

relationship to a legitimate legislative objective. In deciding the issue, the Florida appellate court held that punitive damages are allowed based solely on public policy and, thus, a claim for punitive damages "is subject to the plenary authority of the ultimate policy-maker . . ., the legislature." 585 So. 2d at 1035. It is difficult to reconcile this holding with the Colorado Supreme Court decision in *Kirk v. Denver Pub. Co.*

Finally, in *Shepherd Components v. Brice Petrides, et al.*, 473 N.W. 2d 612 (Iowa 1991), the Supreme Court of Iowa upheld the constitutionality of Iowa Code § 668A.1(2)(b), which required payment of 75% of a punitive damage award to the state Civil Reparation Trust Fund. In line with our decision here today, the court noted that under Iowa law, "punitive damages are not allowed as a matter of right and are discretionary." The Iowa Supreme Court noted that punitive damages are not intended to be compensatory and that "a plaintiff is a fortuitous beneficiary of a punitive damage award simply because there is no one else to receive it." 473 N.W. 2d at 619. The court concluded that the plaintiff did not have a vested right to punitive damages before entry of a judgment. "Consequently, we hold that the trial court's distribution of punitive damages does not violate plaintiff's constitutional rights." 473 N.W. 2d at 619.

Our research discloses seven jurisdictions that limit the availability of punitive damages. Of the seven, five states disallow punitive damages unless expressly allowed by statute or other rule of law. In Connecticut, Nebraska, and Vermont, this prohibition applies only to specific types of cases. Conn. Gen. Stat. § 47-212 (1993) (applies to cases arising under the Common Interest Ownership Act); Neb. U.C.C. 1-106 (1992); Vt. Stat. Ann. tit. 9A, § 1-106(1) (1966) (apply to cases arising under the Uniform Commercial Code). In New Hampshire and South Dakota, the prohibition appears to be a general prohibition applicable to all civil actions. N.H. Rev. Stat. Ann. § 507:16 (1992 Supp.); S.D. Codified Laws Ann. § 21-1-4 (1987).

Two states limit the availability of punitive damages in medical and/or legal malpractice actions. Illinois prohibits punitive damages in "healing art and legal malpractice cases." Ill. Rev. Stat. ch. 735, para. 5/2-1115 (1993). Oregon prohibits punitive damages against licensed, registered, or certified health practitioners for

conduct regulated by the license and within the scope of conduct for which the license was issued. Or. Rev. Stat. § 18.550 (1991).

Two additional states restrict the availability of punitive damages by common law. Louisiana courts have held that Louisiana law does not allow punitive damages. See, e.g., *Hall v. Scott*, 416 So. 2d 223 (La. App. 1982); *Universal C.I.T. Credit Corp. v. Jones*, 47 So. 2d 359 (La. App. 1950). Although Louisiana does not have a specific statute that disallows punitive damages, the case law appears to be based on a statutory provision that requires tortfeasors to "repair" damage they do. Because the statute only requires reparation, the courts have concluded that it does not permit punitive damages. See, e.g., *Ricard v. State*, 382 So. 2d 190 (La. App. 1980).

Nebraska similarly does not allow punitive damages in civil actions. See, e.g., *Miller v. Kingsley*, 194 Neb. 123, 124, 230 N.W. 2d 472 (1975). The rule is based on an interpretation of the Nebraska State Constitution. As noted above, Nebraska's UCC also prohibits punitive damages in cases arising thereunder unless specifically allowed by statute. Neb. U.C.C. § 1-106(1) (1992). We have been unable to discover any cases addressing the constitutionality of the case law or UCC provision in Nebraska.

Finally, the Illinois Supreme Court has upheld the constitutionality of the state's statute barring awards of punitive damages in actions for healing art or legal malpractice. *Bernier v. Burris*, 113 Ill. 2d 219, 497 N.E. 2d 763 (1986). In upholding the constitutionality of this statute, the court determined that the prohibition at issue did not offend equal protection because it was rationally related to a legitimate government goal of avoiding excessive liability. 113 Ill. 2d at 246. Not unlike our case in Kansas of malpractice victims, the court also distinguished punitive damages from compensatory damages.

The above cases and statutes from other jurisdictions provide little, if any, support in addressing the question with which we are faced. Our decision is based upon the Kansas Constitution. The Seventh Amendment of the United States Constitution has not been held to apply to the states.

We note one recent case that addresses more directly the issue with which we are concerned in this case. In *Henderson v. Al-*

*abama Power Co.,* 627 So. 2d 878 (Ala. 1993), 12-year-old Craig Henderson brought suit, by and through his mother, against Alabama Power Company for injuries he sustained while playing on a tower owned and operated by Alabama Power Company. His head contacted one of the power lines, resulting in an electrical "flash" that knocked him from the tower and severely injured him. The suit was based on negligence and wantonness. The court proceeded to trial and the jury, after deliberation, awarded Henderson $15,303.84 in compensatory damages and $500,000 in punitive damages. Alabama Power Company moved for a judgment notwithstanding the verdict, or, in the alternative, for a new trial; and for a remittitur of the punitive damages award. Henderson, in a motion for declaratory judgment and for entry of judgment in excess of $250,000, challenged the constitutionality of Ala. Code, § 6-11-21 (1975), which, subject to enumerated exceptions, limits to $250,000 jury awards of punitive damages.

The Alabama Supreme Court held that this statute violated the Alabama Constitution which, not unlike the Kansas Constitution, provides "that the right of trial by jury shall remain inviolate."

Alabama had previously held in the case of *Moore v. Mobile Infirmary Ass'n,* 592 So. 2d 156 (Ala. 1991), that Ala. Code, § 6-5-544(b) (1975), which limited to $400,000 the amount of "non-economic" damages recoverable in a medical malpractice action, violated the plaintiff's right to trial by jury as guaranteed by art. 1, § 11 of the Alabama Constitution. In deciding the present case, Alabama drew no distinction between compensatory and punitive damages as it related to plaintiff's right to trial by jury. In analyzing the issue, the Alabama Supreme Court relied partially on a prior decision wherein the court had held that the jury trial right protected by art. 1, § 11 of the 1901 constitution is the right as it existed at common law:

" 'The right . . . is confined to those classes of cases in which the right existed at common law, or in which it was used at the time of the adoption of the Constitution.' *Gilbreath v. Wallace,* 292 Ala. 267, 270, 292 So. 2d 651, 653 (1974), quoting *Alford v. State ex rel. Attorney General,* 170 Ala. 178, 188-89, 54 So. 213, 215-16 (1910) (Mayfield, J., dissenting)." *Henderson,* 627 So. 2d at 884.

In our case law, we have extended constitutional protection to rights which existed at common law, but we have said nothing

about those classes of cases in which a jury may have been used at the time of the adoption of the Kansas Constitution. We have drawn a clear distinction between compensatory and punitive damages. We know that both compensatory and punitive damages were determined by juries at common law and at the time our constitution was adopted. At the same time, only compensatory damages existed as a right, a cause of action, and a remedy at that time. The method of determining punitive damages at common law was by jury trial. However, all of our cases recognized that a plaintiff has no vested right to punitive damages and that no right, cause of action, or remedy existed in Kansas separate and apart from an action for compensatory damages.

In *Henderson,* Justice Houston notes in his dissenting opinion that " '[e]xemplary damages are in no case a right of the plaintiff, but are assessed at the discretion of the jury for the purpose indicated. . . . The state had the right to remit [punitive] damages, and by implication did so when it passed the act of ratification.' " *Henderson,* 627 So. 2d at 909. He further notes: "All Justices agree that no citizen has a right to recover punitive damages; therefore, there is no life, liberty, or property interest of a plaintiff involved where punitive damages are concerned." *Henderson,* 627 So. 2d at 912." He further notes that Justice Scalia, in his concurrence in the judgment in *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 39, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991), wrote: " 'State legislatures and courts have the power to restrict or abolish the common-law practice of punitive damages.' "

Justice Maddox, also dissenting in part in *Henderson,* notes that the Alabama Supreme Court had held, not unlike the earlier holdings in Kansas law, that the legislature had the power to abolish the cause of action entirely and not merely the power to limit the recovery in an action. *Henderson,* 627 So. 2d at 899 n.11. As in Justice Maddox's conclusion, we have concluded above that if the legislature or courts have the power to abolish punitive damages altogether, then our legislature certainly has the right to modify the method by which those damages are determined. Plaintiffs in this case have not attacked the right of the legislature to cap punitive damages but have alleged that vesting the right to determine punitive damages in a judge instead of a jury violates

their rights to a trial by jury and the Kansas Constitution. We find nothing in the Kansas Constitution or the common law of this state that prevents the legislature from vesting the determination of punitive damages in a district court instead of requiring that function to be performed by a jury.

C. Right to Due Process

Plaintiffs argue that because juries determined punitive damages at common law, any change by the legislature must comport with due process requirements of the Kansas and United States Constitutions. Plaintiffs rely upon this court's opinion in *Kansas Malpractice Victims Coalition*, 243 Kan. at at 343-44:

"[A]ny statutory modification of the common law must meet due process requirements and be 'reasonably necessary in the public interest to promote the general welfare of the people of the state.' [Citation omitted.] Due process requires that the legislative means selected have a real and substantial relation to the objective sought. [Citation omitted.] One way to meet due process requirements is through substitute remedies."

*Kansas Malpractice Victims Coalition* deals with statutory limitations on a plaintiff's right to compensatory damages:

"Section 5 of the Bill of Rights of the Kansas Constitution provides that the right of trial by jury shall be inviolate. It guarantees the right of every citizen to trial by jury. 'The right of trial by jury is a substantial and valuable right. The law favors trial by jury and the right should be carefully guarded against infringement.' *Waggener v. Seever Systems, Inc.,* 233 Kan. 517, 520, 664 P.2d 813 (1983) (quoting *Bourne v. Atchison, T. & S.F. Rly. Co.,* 209 Kan. 511, 497 P.2d 110 [1972]). 'Trial by jury is guaranteed only in those cases where the right existed at common law.' *Kimball, et al. v. Connor, et al.,* 3 Kan. *414, *432 (1866). Common law allows for recovery of damages for negligent injury (*Tefft v. Wilcox,* 6 Kan. *46 [1870]), and therefore the right to jury trial applies here."

*Kansas Malpractice Victims Coalition* deals exclusively with a remedy for actual damages and does not in any way address punitive damages. Unlike compensatory damages, no separate cause of action existed for punitive damages, and punitive damages were not considered a remedy at common law. A plaintiff had no right to punitive damages at common law.

The legislative change from jury to judge in the determination of the amount of punitive damages does not, therefore, affect a common-law right, a common-law cause of action, or a remedy by due course of law at common law. The legislative change from

jury to judge in determination of the amount of punitive damages does not affect plaintiffs' right to trial by jury under the Kansas Constitution. The legislature was free, therefore, to choose the method of determining punitive damages without implicating plaintiffs' due process rights.

(2) DID THE TRIAL COURT ERR IN HOLDING THAT ELLIOTT'S HEIRS COULD NOT BRING A PUNITIVE DAMAGE CLAIM UNDER THE WRONGFUL DEATH STATUTE?

Carolyn Sue Elliott died instantly. In her wrongful death action, her heirs sought punitive damages. The court held that punitive damages were not recoverable in a wrongful death action.

In 1905, this court decided that punitive damages were not available in wrongful death actions. In *Railway Co. v. Townsend*, 71 Kan. 524, Syl. ¶ 4, 81 Pac. 205 (1905), the court held that the statutory wrongful death cause of action was "for pecuniary loss sustained by the relatives of the deceased, and exemplary damages may not be allowed." After reviewing the law from other jurisdictions, the court concluded that "with a few exceptions, exemplary damages are not allowed [in wrongful death actions] unless expressly provided for by constitution or statute." 71 Kan. at 532. The court reaffirmed *Townsend* in *Rochester v. Express Co.*, 87 Kan. 164, 123 P. 729 (1912), but has not addressed the issue since that time. The plaintiffs argue that *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 755 P.2d 1319 (1988), implicitly overruled *Townsend*, but, as defendants note, *Folks* included a survivor action, which supported a punitive damages claim. 243 Kan. at 58.

Plaintiffs make a very persuasive argument urging us to overrule *Townsend*. Plaintiffs note that it is illogical to allow punitive damages if the victim survives but to deny them if the tortfeasor succeeds in killing the victim. Plaintiffs also refer us to other jurisdictions that have allowed punitive damages in wrongful death actions even though not expressly allowed by statute.

Nevertheless, the message of *Townsend* is that because the cause of action is purely a creature of statute, the only damages available in wrongful death actions are those expressly allowed by the wrongful death statute. The statute establishing the cause of action limits damages to compensatory damages in that it allows

maintenance of an action "for the damages resulting" from the death of a person caused by the wrongful act or omission of another. K.S.A. 60-1901. Moreover, K.S.A. 1992 Supp. 60-1904(a) provides:

"Damages may be recovered for, *but are not limited to*:
(1) Mental anguish, suffering or bereavement;
(2) loss of society, companionship, comfort or protection;
(3) loss of marital care, attention, advice or counsel;
(4) loss of filial care or attention;
(5) loss of parental care, training, guidance or education; and
(6) reasonable funeral expenses for the deceased." (Emphasis supplied.)"

Although the "but are not limited to" language might suggest punitive damages are recoverable, K.S.A. 1992 Supp. 60-1903(c) clarifies the intimation of 60-1901 that only actual damages are recoverable. K.S.A. 1992 Supp. 60-1903(c) requires the trier of fact to render an itemized verdict that reflects the amount awarded for nonpecuniary damages, expenses for the care of the deceased caused by the injury, and other pecuniary damages. It makes no provision for punitive damages. Clearly, the statute on wrongful death in Kansas does not contemplate punitive damages.

A recent Kansas Law Review comment analyzes the availability of punitive damages in wrongful death actions in Kansas and in other states. See Comment, *Punitive Damages in Wrongful Death Actions: How will Kansas Respond?*, 39 Kan. L. Rev. 199 (1990). In addition to Kansas, the comment identifies 20 states and the District of Columbia that do not allow punitive damages in wrongful death actions. 39 Kan. L. Rev. at 208-09. The wrongful death statutes in 11 states expressly allow recovery of punitive damages. 39 Kan. L. Rev. at 208, n. 55. The comment identifies 16 states that allow punitive damages even though they do not have a statute that expressly allows such recovery. 39 Kan. L. Rev. at 211-12.

The wrongful death action is a creature of statute, and we do not believe that the Kansas Legislature intended the wrongful death statute to permit an award of punitive damages. In *Townsend*, 71 Kan. at 532, the statute at issue did not expressly provide for punitive damages, and the court concluded that punitive damages were therefore not available in a wrongful death action. Likewise, our present statute does not authorize punitive damages

and specifically identifies the type of damages that are recoverable. In accordance with earlier decisions of this court, absent an express provision in the statute authorizing punitive damages, we conclude that punitive damages are not recoverable in a wrongful death action in Kansas.

(3) DID THE TRIAL COURT ERR IN LIMITING PLAINTIFFS' THEORIES OF RECOVERY BY PROHIBITING PLAINTIFFS FROM ASSERTING AN INDEPENDENT CLAIM AGAINST RED BALL AND SOUTHWEST FOR NEGLIGENT HIRING, TRAINING, SUPERVISION, OR RETENTION OF PRINTUP?

Plaintiffs contended at trial and contend on appeal that Southwest and Red Ball were not only vicariously liable for Printup's wrongdoing, but also that they were negligent in hiring, training, supervising, and/or retaining Printup. Plaintiffs advance these claims in an effort to establish an independent basis for their claims for punitive damages against Red Ball and Southwest. The district court granted in part defendants' motion for summary judgment on these claims, and allowed plaintiffs to pursue their claims for punitive damages only on the bases allowed by K.S.A. 1992 Supp. 60-3701(d)(1)—that Southwest and/or Red Ball authorized or ratified Printup's conduct.

Although an argument might be made that the trial court should have allowed plaintiffs to proceed on their theory of negligent hiring, training, retention, and/or supervision with respect to compensatory damages, that issue is not presented to the court. Plaintiffs concede that their

"appeal is not taken on any question relating to the liability of defendants for actual damages or the amount of actual damages. The appeal is taken on those orders and issues which relate to the trial court's limitation on the theories and evidence presented on punitive damage claims, liability of the defendants for punitive damages, and the amount of punitive damages awarded."

K.S.A. 1992 Supp. 60-3701(d)(1) limits the availability of punitive damages against an employer or principal for the acts of an employee or agent:

"(d) In no case shall exemplary or punitive damages be assessed pursuant to this section against:

(1) A principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the prinicpal or employer."

Plaintiffs contend that if the employer or principal is independently liable for its own negligent acts in hiring, training, supervision, or retaining the employee/agent, then the limitation in (d)(1) would not apply.

Whether the employer's liability is premised on the principle of negligent hiring/retention or the principle of respondeat superior, the employer's liability is based on the acts of an agent or employee. An employer is not liable for damages for negligently hiring an employee unless and until the employee's conduct causes damage to another. K.S.A. 1992 Supp. 60-3701(d)(2) limits an employer's liability for punitive damages for its employee's conduct to those cases in which the employer authorized or ratified the employee's conduct.

There are several theories under which an employer may be liable for its employee's misconduct. We recently summarized these theories in *Thies v. Cooper*, 243 Kan. 149, Syl. ¶ 1, 753 P.2d 1280 (1988):

"An employer is liable for the tortious acts of an employee only under special circumstances. Special circumstances exist when the employee is on the employer's premises, performing work for the employer, or using the employer's chattel; when the employer voluntarily assumes a duty to control the employee; or when the employer negligently retains a known incompetent or unfit employee."

Before enactment of 60-3701, a corporation could be liable for punitive damages because of an employee's tortious acts committed during the course of employment under the following specific circumstances:

"(a) a corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; (c) the employee was employed in a managerial capacity and was acting within the scope of employment; or (d) the corporation or its managerial agent ratified or approved the act of the employee." *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, Syl. ¶ 4, 666 P.2d 711 (1983).

Although *Kline* expressly allowed recovery of punitive damages based on reckless hiring or retention, 60-3701(d)(1) changed the above rule and specifically limited the circumstances in which a

corporation could be liable for punitive damages for its employee's tortious acts to those described in (a) (authorization) and (d) (ratification) in *Kline*.

In this case, defendants admitted vicarious liability for actual damages. The only bases on which punitive damages could be assessed against Southwest or Red Ball were ratification or authorization. The employer's or principal's alleged negligent acts in hiring, training, supervising, or retaining the employee/agent may not be advanced as a separate claim for punitive damages. The trial court correctly limited the claims for punitive damages to those available under 60-3701(d)(1) based on the employer's or principal's authorization or ratification of Printup's questioned conduct.

(4) DID THE TRIAL COURT ERR IN EXCLUDING EVIDENCE ABOUT RED BALL'S OPERATIONS BEFORE NOVEMBER 8, 1984, AND IN LIMITING EVIDENCE ABOUT RED BALL'S SAFETY PROGRAM AND OTHER RED BALL DRIVERS' CONDUCT?

(5) DID THE TRIAL COURT ERR IN EXCLUDING EVIDENCE ABOUT SOUTHWEST'S RECORDKEEPING PRACTICES AND THE QUALIFICATIONS AND CONDUCT OF OTHER SOUTHWEST DRIVERS?

Red Ball does not really respond to (4) and (5) above. Southwest argues that the court properly excluded the evidence about Southwest because it was unrelated to the cause of the accident. Southwest also complains that plaintiffs' proffer of this evidence was improper because it was in the form of affidavits signed by plaintiffs' counsel. Southwest is partially correct. The affidavit was signed by plaintiffs' counsel, but it also contains citations to deposition testimony and exhibits. The reference to sworn testimony and exhibits protects plaintiffs' proffer from being discarded on a matter of form. The proffer satisfies K.S.A. 60-405.

Plaintiffs argue that the trial court erroneously excluded evidence pertinent to whether exemplary damages should be awarded. The jury determined that exemplary damages should be awarded against Red Ball and Printup but not against Southwest. Plaintiffs argue that the jury may well have concluded punitive damages should have been awarded against Southwest if the evidence had been admitted. They also argue that the

exclusion of the evidence further prejudiced them in the court's determination of the amount of exemplary damages to be awarded against Red Ball and Printup.

The evidence in question involved the following:

(1) evidence of events that occurred before November 8, 1984, including evidence of Printup's previous driving under the influence (DUI) convictions, Printup's safety violations, Printup's driving record, a Department of Transportation safety audit of Red Ball, and Red Ball's allegedly inadequate review and audit procedures;

(2) evidence concerning Red Ball's allegedly inadequate safety program;

(3) evidence concerning the qualifications and conduct of other Red Ball and Southwest drivers; and

(4) evidence concerning Southwest's recordkeeping practices.

Because liability and compensatory damages are not at issue in this appeal, admissibility of the above evidence is governed by the provisions of K.S.A. 1992 Supp. 60-3701(d)(1):

"(d) In no case shall exemplary or punitive damages be assessed pursuant to this section against:

(1) A principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer."

Before we address the precise question raised, three questions must be answered concerning the application of the statute: (1) What is meant by "authorized" and "ratified"; (2) what is meant by the phrase "the questioned conduct"; and (3) what is meant by the words "a person expressly empowered to do so on behalf of the principal or employer"?

(a) Authorized and ratified

K.S.A. 1992 Supp. 60-3701 *et seq.* does not define authorization or ratification. There is no pattern jury instruction in Kansas that defines the terms. In its instructions to the jury, the court did not define the term authorization, which presents a problem that will be discussed later in this opinion. The court did define ratification to mean "the acceptance of a course of conduct or act with an intent to ratify, and with full knowledge of all the material circumstances."

Webster's Third New International Dictionary 146 (1986) defines "authorize" to mean: "to endorse, empower, justify, or permit by or as if by some recognized or proper authority (as custom, evidence, personal right, or regulating power). . .: SANCTION." It defines "ratify" as: "to approve and sanction esp. formally (as the act of an agent or servant): make (as a treaty) valid or legally operative: CONFIRM." Webster's Third New International Dictionary 1885. Black's Law Dictionary 133 (6th ed. 1990) defines "authorize" as follows:

"To empower; to give a right or authority to act. To endow with authority or effective legal power, warrant, or right. [Citation omitted.] To permit a thing to be done in the future. It has a mandatory effect or meaning, implying a direction to act.

" 'Authorized' is sometimes construed as equivalent to 'permitted'; or 'directed', or to similar mandatory language. Possessed of authority; that is, possessed of legal or rightful power, the synonym of which is 'competency.' [Citation omitted.]"

Black's Law Dictionary 1262 defines "ratify" as follows: "To approve and sanction; to make valid; to confirm; to give sanction to."

This court has defined authorization and ratification in the context of whether an agent has authority to act on a principal's behalf. In agency law, express authority exists "if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act." *Mohr v. State Bank of Stanley*, 241 Kan. 42, Syl. ¶ 2, 734 P.2d 1071 (1987). Accord *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, Syl. ¶ 8, 827 P.2d 24 (1992). An agent has implied authority if

"it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal." *Mohr*, 241 Kan. 42, Syl. ¶ 3.

Accord *Barbara Oil Co.*, 250 Kan. 438, Syl. ¶ 8.

In the context of agency law, we have defined ratification as "the adoption or confirmation by a principal of an act performed on his behalf by an agent, which act was performed without authority." *Schraft v. Leis*, 236 Kan. 28, Syl. ¶ 9, 686 P.2d 865 (1984).

Kansas has not addressed the definition of the above terms under the provisions of 60-3701(d)(1). However, the above cited Kansas cases and the following cases from other jurisdictions that allow punitive damages against employers for ratifying or authorizing employees' wrongful conduct are instructive. Other jurisdictions with statutes similar to 60-3701(d)(1) have held that knowledge of an employee's wrongful conduct, coupled with failure to discipline the employee, amounts to implied ratification or authorization. See, *e.g., Khalid Bin Talal Etc. v. E.F. Hutton & Co.,* 720 F. Supp. 671, 683 (N.D. Ill. 1989) (applying Illinois law, company's awareness of illegal trading activity and allowing it to continue "more than suffices to constitute authorization . . . as well as ratification"); *Hart v. National Mortgage & Land Co.,* 189 Cal. App. 3d 1420, Syl. ¶ 7, 235 Cal. Rptr. 68 (1987) (plaintiff's allegations that superiors were aware of harassment but did nothing to discipline coworker sufficient to allege employer's ratification of coworker's misconduct); *Hartman v. Shell Oil Co.,* 68 Cal. App. 3d 240, Syl. ¶ 3, 137 Cal. Rptr. 244 (1977) (management's knowledge of employee's fraudulent representations coupled with failure to discharge or reprimand employee are among the factors that supported the jury's finding that corporation authorized or ratified employee's conduct); *Wirig v. Kinney Shoe Corp.,* 448 N.W.2d 526, 534 (Minn. App. 1989), *aff'd in part, rev'd in part on other grounds* 461 N.W.2d 374 (Minn. 1990) (corporation implicitly ratified employee's harassment of coworker by observing it and allowing it to continue unchecked).

Some courts have held that an employer's actual knowledge and obvious tolerance of the employee's misconduct is not required. For example, general corporate policies can "authorize" employee misconduct. In *Templin v. Mountain Bell Tel. Co.,* 97 N.M. 699, Syl. ¶ 4, 643 P.2d 263 (Ct. App. 1982), the New Mexico Court of Appeals held that summary judgment was improper because a genuine issue of material fact existed regarding whether the phone company's general policies authorized procedures that ultimately permitted installation of an off-premises extension of a woman's phone in her ex-husband's apartment. The testimony at trial indicated that the employees did not violate

any company policy or procedure in granting the ex-husband's request for the off-premises extension. 97 N.M. at 701-04.

An employer's failure to investigate its employees' wrongful conduct also can justify imposition of punitive damages. In upholding a punitive damage award against a corporate employer based on ratification/authorization in a sexual harassment action, the United States District Court for the District of Ohio found that the management knew or "should have known" that the harassing employee was wrongfully withholding the plaintiff's performance evaluations and salary reviews. The court stated that the harasser's "failure to appraise plaintiff's work, in addition to the rumors about him circulating among . . . managerial employees, should have prompted his superiors to investigate the situation. However, no action was taken." *Shrout v. Black Clawson Co.*, 689 F. Supp. 774, 783 (S.D. Ohio 1988). Accord *Brink's, Inc. v. City of New York*, 546 F. Supp. 403, 412 (S.D.N.Y. 1982).

At least one court has declined to impose punitive damage liability for ratification/authorization where the employer did not have actual knowledge of the employee's wrongful act. In *Commercial Credit Equipment Corp. v. Stamps*, 920 F.2d 1361 (7th Cir. 1990), a credit company filed a declaratory judgment action against an alleged debtor to determine the debtor/defendant's liability on a note. The defendant had claimed from the beginning that the loan documents were forged and, as it turned out, they were forged. The defendant attempted to impose liability on the credit company for punitive damages for its employee's fraud, alleging that by filing the declaratory judgment action, the credit company ratified the employee's forgery of the documents. The court rejected this contention, finding that the company was entitled to rely on the documents in its possession even though the alleged debtor always maintained they were forged. The court noted:

"(If the lender must accept as truthful any allegations of forgery, its business enterprise would be short lived.) . . . Inferring ratification of fraud from a finance company's collection efforts, when the loan documents turned out to be forged, would place finance corporations in an untenable Catch-22 position whenever a debtor claims that loan documents are false." 920 F.2d at 1370.

*Stamps*, however, is distinguishable from the other cases discussed above wherein there were facts that should have put the employer on notice that the employee was engaged in misconduct.

Based upon the dictionary definitions, Kansas case law, and the law of other jurisdictions, we hold that authorization under the provisions of K.S.A. 1992 Supp. 60-3701(d)(1) may be either express or implied and generally is accomplished before or during the employee's questioned conduct. It may be based on an express grant of authority or on a course of conduct indicating that the employee was empowered or given the right or authority to engage in the questioned conduct. Ratification under the provisions of 60-3701(d)(1) may be either express or implied and may be accomplished before, during, or after the employee's questioned conduct. It may be based on an express ratification or based on a course of conduct indicating the approval, sanctioning, or confirmation of the questioned conduct.

(b) Questioned conduct

K.S.A. 1992 Supp. 60-3701(d)(1) requires that an employer authorize or ratify the employee's conduct that gives rise to the cause of action. In other words, the conduct that is authorized or ratified must be causally connected to the resulting harm.

This interpretation is consistent with Kansas law regarding employers' liability for employees' misconduct. See, *e.g., Hollinger v. Stormont Hosp. & Training School for Nurses*, 2 Kan. App. 2d 302, 307-08, 578 P.2d 1121, *rev. denied* 225 Kan. 844 (1978) (approving instruction in negligent hiring claim that required a causal connection between the employee's dangerous propensities and the injuries suffered). We conclude that there must be a determination that the corporate defendants authorized or ratified the conduct of Printup that proximately caused the accident.

(c) By a person expressly empowered to do so on behalf of the principal or employer

K.S.A. 1992 Supp. 60-3701(d)(1) requires that the principal or employer authorize or ratify, or that a person expressly empowered to do so on behalf of the principal or employer authorize or ratify, the questioned conduct. As stated above, both authorization and ratification may be based on a course of conduct

indicating that the employee was empowered to engage in the questioned conduct or that the employer implicitly approved or sanctioned the questioned conduct. Therefore, when 60-3701(d)(1) states that "unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer," it necessarily refers to a person provided with the express authority to act on behalf of and bind the principal or employer. For example, a managing agent of an employer or principal normally would possess the express power to bind the employer or principal. Thus, a managerial agent acting on behalf of the principal or employer could ratify or authorize an agent's or employee's questioned conduct within the meaning of those terms under 60-3701(d)(1). In this connection, the words of the *Kline* decision are instructive: "(a) a corporation or its managerial agent authorized the doing and manner of the act; . . . or (d) the corporation or its managerial agent ratified or approved the act of the employee." 233 Kan. 988, Syl. ¶ 4. The statutory phrase does not require that the person be *expressly* empowered to authorize or ratify the questioned conduct of the agent or employee but only that the person be expressly empowered to act on behalf of and bind the principal or employer.

Having addressed how 60-3701(d)(1) is generally to be applied, we now consider its application to the questioned evidence. The trial court excluded evidence of pre-November 1984 occurrences because they were too remote in time to be relevant. It is not clear precisely why the court selected November 8, 1984, but it appears to have selected the date in part to give Red Ball the opportunity to correct problems the Department of Transportation (DOT) identified during an audit. While we agree that conduct nearly three years before the accident may be remote in time, evidence of a course of causally related misconduct over a three-or-more-year period is relevant. Thus, if the conduct at issue occurred only before November 8, 1984, we agree with the trial court that it is not relevant to the cause of action and properly was excluded. If there is evidence of causally related misconduct that occurred before November 8, 1984, and after November 8, 1984, the evidence of the pre-November 1984 conduct nevertheless is relevant because it shows a long-term pattern of the same misconduct. We offer the following guidance with respect

to the specific categories of pre-November 1984 evidence about which plaintiffs complain.

Plaintiffs primarily argue that evidence of Printup's previous DUI convictions was relevant to their negligent employment claims. They also contend, however, that such evidence indicates the corporate defendants' indifference to and disregard of safety considerations and, thus, it is relevant to punitive damages. There was, however, no evidence that Printup's use of alcohol caused or contributed to the accident. Highway Patrol Officer Heryford testified that he secured blood samples from each party involved in the accident and sent those samples to the Kansas Bureau of Investigation for analysis. He testified that the results of the analysis had no bearing on the accident. Absent some evidence that Printup's use of alcohol caused or contributed to the accident, we need not address whether Red Ball's or Southwest's alleged disregard of Printup's prior DUI convictions amounted to ratification or authorization of driving under the influence. Absent some connection to the accident, evidence of Printup's prior DUI convictions is not relevant or admissible. The trial court did not err in excluding evidence of Printup's pre-November 1984 DUI convictions.

Plaintiffs also argue that the trial court erroneously excluded evidence of the results of Red Ball's 1983 DOT safety audit, Red Ball's allegedly inadequate procedures to review and audit drivers' logs, Red Ball's allegedly inadequate safety program, Southwest's allegedly inadequate recordkeeping practices, and evidence of other drivers' conduct. These are broad categories of evidence. Based on our review of the briefs and record, plaintiffs appear to be primarily concerned about evidence that Southwest and Red Ball did not enforce federal requirements and corporate policies regarding drivers' hours of service, drivers' log books, and safety inspections.

As noted above, ratification and authorization are broad enough to encompass evidence that the corporate defendants knew or should have known about employee misconduct and evidence of corporate policies, procedures, or managerial behavior that a jury reasonably could infer implicitly authorized or ratified the questioned conduct. Accordingly, evidence that Southwest or Red Ball knew or should have known that Printup was violating safety

regulations, but did nothing to require his compliance, is relevant to authorization or ratification. Whether such evidence is admissible, however, depends upon an additional finding that the safety violations at issue caused or contributed to the accident.

Based on our review of the record, at least some evidence about the companies' safety programs and procedures is relevant and admissible. Plaintiffs' theory is that Printup had a long history of falsifying his driving logs and inspection reports and that the companies for which he worked had a long history of tolerating such violations. If the jury could find that fatigue due to hours of service violations caused or contributed to the accident, then evidence that the companies knew or had reason to know of Printup's false logs and hours of service violations is relevant to authorization and ratification of conduct that caused or contributed to the accident.

There is evidence in the record from which the jury could infer that Printup was tired or fell asleep and lost control of the tractor-trailer. The accident occurred near midnight. The tractor-trailer jackknifed and crossed the median, blocking the path of oncoming traffic. Printup testified variously about when his day started. On September 15, 1987, the day of the accident, at the earliest, he went on duty at 4:30 a.m.; at the latest, he got up at 4:30 and went on duty at 6:30 a.m. He drove from Foristell, Missouri, to Kansas City, where he made a delivery. He testified that he then went to Olathe, where he stayed from about 6:00 to 9:00 p.m. He testified that after leaving Olathe at about 9:00 p.m., he did not stop until the accident, except to get a ticket at the toll gate. Although Printup's testimony is not consistent, it is clear that he had a long day. He had been on the go (although not necessarily "on duty and driving" for purposes of federal regulations) from at least 6:30 a.m. until 6:00 p.m. when he took, at most, a three-hour break before driving another three hours prior to the accident.

The accident investigation was not conclusive as to whether Printup fell asleep at the wheel. Patrolman Brent Joy was equivocal about whether driver fatigue was a factor. Officer Heryford testified that he concluded Printup was in the right-hand lane when Printup's problems started. On cross-examination, Heryford testified that drivers who fall asleep generally tend to follow the

contour of the road, rather than crossing the hump in the center of the road. Thus, if Printup had performed like the normal sleeping driver, his truck would have gone off the right side of the road instead of crossing the median. Of course, fatigue could have been a contributing factor even if Printup did not actually fall asleep. Moreover, the jury was entitled to weigh this evidence as it saw fit.

The jury could have found that Printup's fatigue caused or contributed to the accident. The inconsistency of his testimony and his logs could support an inference that he was tired because he had worked more hours than he should have. Accordingly, the trial court erred by excluding relevant evidence that Southwest and Red Ball knew or should have known about log book and hours of service violations and had failed to require compliance with those safety regulations.

We recognize that at the time of the accident and for several years before the accident, Printup had submitted his logs to Red Ball, not Southwest. Printup had, however, worked for Southwest for 26 years. Southwest's historical treatment of Printup's alleged noncompliance with log and hours of service requirements is relevant. Southwest was his employer and had authority to fire him. To the extent Printup's noncompliance was related to fatigue, Red Ball's and Southwest's tolerance of such noncompliance was both relevant and admissible.

The trial court did not err in excluding evidence that Printup falsified vehicle inspection reports because there was no evidence in the record that a mechanical problem caused or contributed to the accident. Officer Joy specifically testified that he did not find any mechanical defects in Printup's truck that caused or contributed to the accident. Joy did find a problem with one brake drum and one tire, but plaintiffs did not present any evidence that those defects caused or contributed to the accident. Absent any causal relationship between inadequate inspections and the accident, evidence of such violations is not relevant or admissible.

Evidence about other drivers' conduct is not pertinent to ratification or authorization of Printup's conduct unless the other drivers' conduct is related to fatigue-causing conditions. The companies' tolerance of false logs and hours of service violations is

evidence from which the jury could infer that the companies were sending a message to Printup and other drivers that such conduct was acceptable. The jury could infer that the companies authorized or ratified such conduct. Similarly, the trial court erred in excluding evidence about Southwest's recordkeeping practices to the extent the evidence pertained to driving logs or hours of service and thus driver fatigue.

The erroneous exclusion of evidence is not grounds for reversal unless it affects the substantial rights of the parties. K.S.A. 60-261. The exclusion of the above evidence from the jury on the question of whether plaintiffs should be awarded punitive damages against Southwest affected the substantial rights of the plaintiffs. Accordingly, that portion of the judgment is reversed, and the case remanded for a jury determination of whether plaintiffs are entitled to recover punitive damages against Southwest.

The jury determined that punitive damages should be awarded against Red Ball and Printup. It did so based on evidence admitted. We have concluded that the exclusion of evidence prejudiced the rights of the plaintiffs. However, the plaintiffs suffered no prejudice by such exclusion of evidence regarding Red Ball and Printup because, based on evidence admitted, the jury concluded that punitive damages should be awarded against Red Ball and Printup. There is no reason to believe the result would be different for Red Ball and Printup on remand because our ruling will allow additional evidence bearing on authorization and ratification. As to this jury determination, plaintiffs suffered no prejudice, and that portion of the jury determination is affirmed.

The exclusion of evidence also affected the substantial rights of plaintiffs as to the court's determination of the amount of punitive damages. The punitive damages awards against Red Ball and Printup are reversed and remanded for further consideration by the court. While the excluded evidence relates to authorization and ratification, it also relates to the conduct of Printup and Red Ball. With new evidence, a determination of the amount of punitive damages against these two defendants may change.

If, upon remand, the jury should decide that plaintiffs are entitled to punitive damages against Southwest, the court must determine the amount. If the jury concludes otherwise, the

court's consideration is limited to a determination of the amount of punitive damages to be assessed against Red Ball and Printup.

We realize that we have not specifically addressed each particular item of evidence about which plaintiffs complain. Rather, we have attempted to discuss categories of evidence and set forth guidelines to aid the parties and the trial court in determining what additional evidence should be admitted. As should be clear from the foregoing discussion, the admissibility of particular evidence about Southwest or Red Ball depends upon whether the evidence tends to prove that either company ratified or authorized conduct that caused or contributed to the accident. We trust the foregoing discussion will aid the parties and the court in determining the admissibility of particular items of evidence upon remand.

(6) DID THE TRIAL COURT ERR IN INSTRUCTING THE JURY ABOUT WHAT CONDUCT BY RED BALL OR SOUTHWEST AMOUNTED TO RATIFICATION AND AUTHORIZATION OF PRINTUP'S CONDUCT?

The only basis for punitive damages against Red Ball or Southwest was under the provisions of K.S.A. 1992 Supp. 60-3701(d)(1):

"(d) In no case shall exemplary or punitive damages be assessed pursuant to this section against:

(1) A principal or employer for the acts of an agent or employee unless the questioned conduct was *authorized* or *ratified* by a person expressly empowered to do so on behalf of the principal or employer." (Emphasis added.)

Plaintiffs requested that the court instruct the jury as to authorization and ratification. The court defined ratification only by saying that it meant "the acceptance of a course of conduct or act with an intent to ratify, and with full knowledge of all the material circumstances." The court used the term ratify to define ratification and failed to define authorization. The court's failure to instruct the jury upon request on both means by which the jury could conclude that punitive damages may be awarded was clearly erroneous.

Under the more restrictive definition of ratification, the jury concluded that Red Ball should be responsible for punitive damages. There is no reason to conclude that this result would change with a new jury under the more expansive definitions of ratifi-

cation and authorization adopted in this opinion. Red Ball has no basis to complain. However, with proper jury instructions on both ratification and authorization, a jury may conclude that Southwest also should be responsible for punitive damages. Accordingly, we have concluded that the jury verdict on the issue of whether punitive damages should be awarded against Southwest must be reversed. Upon remand, the court should instruct the jury by defining the terms authorization and ratification. Its failure to define authorization was clearly erroneous. See *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 92, 671 P.2d 491 (1983). Instructions upon remand should be consistent with this opinion.

Red Ball, in its cross-appeal, claims that the trial court erred in allowing punitive damages on a finding of ratification when there was no evidence of Red Ball's conduct after the accident that might amount to ratification. Many of the cases we have read and discussed in this opinion speak of ratification and authorization together, but they all suggest that if corporate management obviously tolerates the kind of conduct that causes the injury, it amounts to ratification and/or authorization. Most of these cases, however, involve a continuing course of tortious conduct. *Khalid Bin Talal Etc. v. E.F. Hutton & Co.*, 720 F. Supp. 671 (N.D. Ill. 1989) (recurring misconduct in commodities trading); *Hart v. National Mortgage & Land Co.*, 189 Cal. App. 3d 1420, 235 Cal. Rptr. 68 (1987) (sexual harassment); *Wirig v. Kinney Shoe Corp.*, 448 N.W.2d 526 (Minn. App. 1989) (sexual harassment). In those cases, ongoing tolerance logically amounts to ratification.

Red Ball, however, argues that this case involves a one-time tort and, under these circumstances, plaintiffs must show that the corporate defendant did something after the accident to confirm that Printup's behavior was acceptable. Thus, Red Ball contends that absent some evidence of post-accident ratifying conduct, it was not proper to find that Red Ball ratified Printup's action. We have addressed this contention in our above discussion of the terms authorization and ratification. The cases cited in the previous section indicate that ratification may but does not necessarily require an express act after the tort is committed. Upon remand, the court should instruct the jury on ratification in a manner consistent with this opinion.

(7) DID THE TRIAL COURT ERR IN REFUSING TO RE-
QUIRE RED BALL TO PRODUCE CERTAIN FINAN-
CIAL AND PARENT COMPANY INFORMATION FOR
USE IN THE POST-TRIAL PROCEEDINGS TO DE-
TERMINE THE AMOUNT OF PUNITIVE DAMAGES?

Financial information about Red Ball is pertinent to the issue
of punitive damages in two respects. First, Red Ball's gross annual
income is relevant with respect to the statutory cap on punitive
damages. K.S.A. 1992 Supp. 60-3701(e) caps punitive damages
at the lesser of (1) Red Ball's highest gross annual income in any
one of the five years preceding the accident or (2) $5 million.
Second, in determining the amount of punitive damages to be
awarded, K.S.A. 1992 Supp. 60-3701(b) permits the court to con-
sider, among other things, "(3) the profitability of the defendant's
misconduct; . . . (6) the financial condition of the defendant; and
(7) the total deterrent effect of other damages and punishment
imposed upon the defendant as a result of the misconduct."

Plaintiffs complain on appeal that the trial court erred in not
requiring Red Ball to produce "complete financial records re-
garding its financial condition and relationship with its parent
company, American Red Ball." Plaintiffs do not identify with any
particularity the records they claim were not produced. The only
records they specifically sought at trial were "financial records
reflecting its gross annual income earned in the years 1983
through 1987." They do not complain on appeal that Red Ball
failed to produce such records, and the records that were pro-
duced are not in the record, so we are unable to make any
independent determination about whether plaintiffs obtained the
requested records. If plaintiffs asked only for specific records, the
trial court granted their motion, and Red Ball produced the re-
quested records, we cannot now find the trial court erred by
failing to compel production of records not requested. It is ap-
pellants' burden to designate a record that is sufficient to present
their points and to establish the claimed error. *Sterba v. Jay,*
249 Kan. 270, 280, 816 P.2d 379 (1991). Without an adequate
record, plaintiffs' claim of alleged error fails. See, *e.g., State v.
Dunn,* 249 Kan. 488, 496, 820 P.2d 412 (1991).

We also note that plaintiffs' position at trial seemed to be that
only information specifically about the defendant, Red Ball, was

relevant and admissible. Red Ball called as a witness Mr. Saubert, the president of American Red Ball Corporation, the parent company of Red Ball. Plaintiffs objected on relevance grounds to Red Ball's inquiry about various operations of one of the other subsidiaries. The court asked what all this had to do with defendant Red Ball. Defense counsel assured the court it was trying to make clear the distinction between the two corporations because consolidated financial statements were being submitted. These financial statements are not in the record. The court made it clear it would only look to Red Ball when evaluating its financial condition for purposes of punitive damages assessment. Before relinquishing this line of questioning, however, defense counsel sought assurances from the court and plaintiffs' counsel that they agreed that "American Red Ball Transit Company is the only corporation that is at issue at this point." Plaintiffs' counsel stated on the record: "That's what I have always assumed. If there's something else going on, I don't know about it."

Moreover, plaintiffs objected at trial to the admissibility of an "audited financial statement of American Red Ball Corporation and subsidiaries." Plaintiffs objected to the exhibits on relevance grounds because only a "couple of pages" had anything to do with Red Ball. It was the trial court that decided the exhibits should be admitted because the corporations may "interconnect."

Plaintiffs did not ask the court to require Red Ball to produce specific additional information and appeared to be willing to defer to the court's determination of what it needed. While plaintiffs stated in the record that information on accounting methods, nature of expenses, attachments, and supporting documents were not produced and that information about accounting methods would give a more complete picture, plaintiffs did not specifically request production of any additional specific information. Thus, the court did not deny a specific request for specific information.

Finally, on appeal, plaintiffs have not been able to explain to this court exactly what information they did not receive in the trial court. Plaintiffs claim they are entitled to "complete financial records regarding [Red Ball's] financial condition and relationship with its parent company." Plaintiffs did not include in the record the documents they did receive, and plaintiffs have not precisely described, here or in the trial court, what additional information

they want. Under these circumstances, the trial court did not err. Upon remand, the parties are limited to presentation of only those financial records previously admitted.

(8) DID THE TRIAL COURT ERR DURING POST-TRIAL PROCEEDINGS BY ADMITTING EVIDENCE OF POST-ACCIDENT CONDUCT TO MITIGATE PUNITIVE DAMAGES AND BY ADMITTING CONTENTS OF SETTLEMENT NEGOTIATIONS?

A. Post-Accident Conduct

Plaintiffs claim that the trial court erred in allowing Red Ball to present evidence of post-accident remedial conduct that occurred long after the accident, in an effort to mitigate punitive damages. The subsequent remedial conduct includes, but is not limited to: a drug testing program implemented in 1987; a driver evaluation form initiated in 1988 and used to qualify drivers; classroom training and driver training programs implemented in 1988; a driver log evaluation form implemented in 1988; and a point system that assigned points for various infractions and imposed various consequences based upon points accumulated.

K.S.A. 1992 Supp. 60-3701 provides that subsequent remedial measures are relevant and admissible on the issue of punitive damages. K.S.A. 1992 Supp. 60-3701(b)(5) allows the court to consider "the attitude and conduct of the defendant upon discovery of the misconduct." The theory behind this provision is that a contrite defendant who promptly takes steps to remedy a problem that contributed to a plaintiff's injury should not be punished as severely as a defendant who maintains business as usual after the incident giving rise to the claim for punitive damages.

At the hearing on punitive damages, the court sustained plaintiffs' objection to Red Ball's evidence of subsequent remedial conduct. Red Ball was allowed to present a proffer of evidence in the form of Lamont Brantley's testimony. Brantley testified about improvements in Red Ball's safety program. The court later notified counsel by letter that it had reconsidered its earlier decision and decided to admit the evidence. Plaintiffs were then allowed to, and did, cross-examine Brantley by deposition. However, the transcript of that deposition is not in the record, so it

is impossible to determine if appellants were correct that "[t]wo significant things were revealed during that testimony."

Plaintiffs claim that Brantley's deposition testimony revealed that the subsequent remedial conduct was just part of the "natural progression" of the company's safety program and that "nearly all of these changes were made in 1990 or 1991; most were made within a few months of trial." Accordingly, plaintiffs claim the evidence of subsequent remedial conduct is not probative of the "attitude and conduct of the defendant upon discovery of the misconduct" because Red Ball was scheduled to take this action in any event, and most of the action was not taken until long after the accident. Even if this testimony would render all or some of the subsequent remedial conduct evidence inadmissible, without the deposition transcript, we are unable to determine whether plaintiffs' claim is true. "A party must designate an adequate record on appeal to substantiate contentions made to the appellate court. Without such a record, claims of alleged error must fail. Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal." *Eisenhut v. Steadman*, 13 Kan. App. 2d 220, 223, 767 P.2d 293 (1989).

Additionally, the language "the attitude and conduct of the defendant upon discovery of the misconduct" may reasonably be construed to extend to remedial conduct taken after the tort. On the facts of this case, the efforts to improve a safety program for a large moving company are likely to require a substantial amount of time to implement and refine. It would not be unreasonable to assume that such action may very well take from a few months to a few years. The amount of time that elapses between the accident and the time the corrective measure goes into effect relates more to the weight of the evidence than to its admissibility. We conclude that, on the facts of this case, the trial court did not err in allowing evidence of subsequent remedial conduct.

We hold that K.S.A. 1992 Supp. 60-3701(b)(5) makes the above evidence of remedial conduct relevant. Plaintiffs have not included their cross-examination of Brantley in the record. The testimony that is in the record describes, for the most part, remedial actions taken within a year or two after the accident. This evidence was admissible as reflective of the attitude and conduct of Red Ball upon discovery of the conduct within the

meaning of 60-3701(b)(5). Because plaintiffs have failed to designate a record sufficient to review specific allegations of error and because the lapse of time alone does not render the evidence of remedial conduct inadmissible, we conclude that the trial court did not err in allowing evidence of subsequent remedial conduct as it related to punitive damages. Our ruling is to govern proceedings upon remand.

B. Settlement Negotiations

Defendants called plaintiffs' counsel to testify during the hearing on punitive damages. This action was taken in response to the court's admission of plaintiffs' Exhibit 59, which was plaintiffs' counsel's affidavit about plaintiffs' litigation expenses. We note that plaintiffs' Exhibit 59 was not included in the record on appeal. Plaintiffs argued that the court should consider the expenses of litigation in determining the punitive damages award. The trial court admitted plaintiffs' Exhibit 59 over defendants' objections.

In response to the admission of Exhibit 59, the defense called plaintiffs' counsel as a witness in order to cross-examine Exhibit 59. For the purposes of this cross-examination, the court directed counsel to treat Exhibit 59 as plaintiffs' counsel's testimony on direct examination.

During the course of this cross-examination, defendants' counsel inquired into settlement negotiations that arose during pretrial stages of litigation. The defense contended that if plaintiffs' litigation costs were relevant to punitive damages, settlement discussions also were relevant because they demonstrated that unnecessary expenses were incurred. Basically, defendants claimed that because plaintiffs could have settled the case before trial for more than their actual damage judgment, many of their litigation expenses were unnecessary.

In support of their argument that the court erroneously allowed evidence concerning settlement negotiations, plaintiffs rely upon the case of *Ettus v. Orkin Exterminating Co.*, 233 Kan. 555, 665 P.2d 730 (1983), wherein the court held that absent unusual circumstances, "settlement offers and negotiations are inadmissible in evidence even when offered for the limited purpose of defending against an award of punitive damages." 233 Kan. at 570-71. The reason for this, as we noted in *Ettus*, is that so many

factors besides the defendant's culpability enter into settlement negotiations, and the policy behind punitive damages is punishment and deterrence of culpable conduct. 233 Kan. at 570. Accordingly, evidence of settlement discussions is not particularly probative and may in fact muddy the waters on punitive damages issues. We support the holding in *Ettus*, but we note that the court in that case indicated that in unusual circumstances, settlement offers and negotiations may be admissible in evidence when offered for the limited purpose of defending against an award of punitive damages.

In this case, we believe unusual circumstances were demonstrated and that defendants properly were allowed to question Exhibit 59 of plaintiffs by cross-examining on the basis of whether the expenses contained in Exhibit 59 were actually necessary expenses. We think it important that this occurred in a hearing before the trial court outside the presence of the jury for the purpose of allowing defendants to respond to plaintiffs' claim of necessary litigation expenses. The evidence was admissible under these unusual circumstances, even though its probative value may have been limited. We note one limitation is that so many other factors besides defendants' culpability enter into settlement negotiations that the evidence of failure to settle is of limited value. We also recognize that hindsight is always 20-20. It was defendants' contention that plaintiffs' litigation expenses were unnecessary because the settlement offers approximated or exceeded the actual damage award for which the court entered judgment. All of these factors, however, go to the weight to be given to the evidence and not to its admissibility. The evidence defendants offered is at best a second guess of settlement decisions involving many factors other than punitive damages. Yet, again, while the evidence may have been of limited probative value, it was plaintiffs who raised the question by claiming necessary and reasonable litigation expenses. Under these unusual circumstances, it is fair that defendants be given an opportunity to question the necessity of such litigation expenses. Accordingly, the trial court did not err by allowing evidence regarding reasonableness and necessity of litigation expenses under these limited circumstances.

(9) DID THE TRIAL COURT ERR IN REFUSING TO HOLD RED BALL JOINTLY AND SEVERALLY LIABLE

FOR THE PUNITIVE DAMAGE AWARD ASSESSED AGAINST PRINTUP?

Plaintiffs claim that Kansas law permits imposition of joint and several liability on an employer and employee for punitive damages assessed against the employee. In support, they cite *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 666 P.2d 711 (1983), and *Southern American Ins. v. Gabbert-Jones, Inc.*, 13 Kan. App. 2d 324, 769 P.2d 1194 (1989). *Gabbert-Jones* involved the following two issues: (1) whether liability of punitive damages was within the scope of the insuring agreement between the two parties; and (2) whether public policy prevented the insurer's liability for punitive damages. 13 Kan. App. 2d at 326. Joint and several liability between an employer and employee was not an issue in *Gabbert-Jones*.

Joint and several liability also was not an issue in the *Kline* case. In *Kline*, the plaintiff did not sue the agents and employees; he sued only the employer/principal. 233 Kan. at 989. The issue in *Kline* was whether the employer could be liable for punitive damages for its employees' acts—not whether it was jointly and severally liable for a punitive damage award assessed separately against its employees.

The imposition of joint and several liability for punitive damages is contrary to the purpose for which punitive damages are awarded. Punitive damages are awarded to punish the wrongdoer. Each wrongdoer is liable to pay the punitive damages assessed against him or her. The amount of the award is to be calculated with the individual defendant's financial status and conduct in mind. K.S.A. 1992 Supp. 60-3701(b), (e) and (f). Joint and several liability undermines these considerations and therefore is unavailable. In contrast, joint and several liability for compensatory damages, under appropriate circumstances, is consistent with their purpose, which is to compensate the tort victim. Accordingly, the trial court did not err in refusing to hold Red Ball jointly and severally liable for the punitive damage award assessed against Printup.

(10) DID THE TRIAL COURT ERR IN REFUSING TO ASSESS TREBLE DAMAGES AGAINST PRINTUP AND RED BALL AS PART OF THE PUNITIVE DAMAGE AWARD?

Plaintiffs claim that the trial court erred in not assessing treble damages pursuant to K.S.A. 66-176, which provides:

"Any public utility or common carrier which shall violate any of the provisions of law for the regulation of such public utilities or common carriers shall forfeit, for every offense, to the person, company or corporation aggrieved thereby, three times the actual damages sustained by the party aggrieved, together with the costs of suit, and a reasonable attorney fee, to be fixed by the court; and if an appeal be taken from the judgment or any part thereof, it shall be the duty of the appellate court to include in the judgment an additional reasonable attorney's fee for services in the appellate court or courts."

The plaintiffs did not timely raise this issue. This claim was not presented to the trial court until nearly four months after plaintiffs filed their notice of appeal. Accordingly, the trial court properly denied their motion to modify judgment.

Plaintiffs seek this court's indulgence on the basis that the Court of Appeals did not decide until December 27, 1991, that K.S.A. 66-176 created a right of action for individuals injured by common carriers. *Dietz v. Atchison, Topeka & Santa Fe Rwy. Co.*, 16 Kan. App. 2d 342, 823 P.2d 810 (1991). However, *Dietz* was decided before plaintiffs filed their notice of appeal, and K.S.A. 66-176 was on the books long before this case ever went to trial. We decline to entertain plaintiffs' claim.

(11) DID THE TRIAL COURT ABUSE ITS DISCRETION IN DETERMINING THE AMOUNT OF PUNITIVE DAMAGES?

Because we have reversed the court's assessment of punitive damages and remanded for further consideration, we need not address this issue.

PRINTUP'S CROSS-APPEAL

(1) DID THE TRIAL COURT ERR IN SUBMITTING TO THE JURY SMITH'S CLAIM OF PAIN AND SUFFERING?

Printup claims the court erred in submitting to the jury Smith's claim of conscious pain and suffering because it was not supported by the evidence. Printup argues that the sole expert witness (the coroner) testified that Smith endured no conscious pain and suffering and that the remaining testimony was inconclusive. Lay witness testimony can support a verdict for pain and suffering.

*Gregory v. Carey*, 246 Kan. 504, 510, 791 P.2d 1329 (1990); *Leiker v. Gafford*, 245 Kan. 325, 342, 778 P.2d 823 (1989). There was lay witness testimony in this case about Smith's behavior at the scene of the accident supporting a reasonable inference that he endured conscious pain or suffering. Mark Woodhouse testified that Smith was breathing erratically and that he appeared to respond with a two-syllable sound and body movement to Woodhouse's statement that help was on its way.

There was conflicting testimony from emergency personnel. One highway patrolman testified that he believed Smith was unconscious. A volunteer firefighter testified that he could not opine whether Smith was conscious immediately after the impact. An EMT testified that what he observed suggested Smith was not conscious. The coroner who examined Smith after he died testified that, given the nature of Smith's injuries, it was possible, but not medically probable, that Smith was conscious after the impact.

Woodhouse, however, was the first person on the scene. None of the more experienced personnel arrived until 10-25 minutes after the crash. Accordingly, the jury could reasonably have inferred that Woodhouse observed things that others did not, and that what he observed indicated Smith endured conscious pain and suffering. There was sufficient evidence in the record to submit to the jury Smith's claim of pain and suffering.

(2) DID THE TRIAL COURT ERR IN SUBMITTING TO THE JURY SMITH'S CLAIM THAT PRINTUP'S CONDUCT WAS WANTON?

For an act to amount to wantonness, the actor must have reason to believe that his act may injure another and commit the act anyway, with indifference to whether it injures another. *Frazier v. Cities Service Oil Co.*, 159 Kan. 655, 157 P.2d 822 (1945). Printup argues that there was not clear and convincing evidence that he realized the imminence of danger from his actions.

Printup testified that he knew what the law required regarding accurate logs and limited work hours. He nevertheless acknowledged numerous log violations, including the logs for the days and weeks immediately preceding the accident. His testimony included huge discrepancies between his logs, his prior testimony, and his trial testimony about his activity on the day of the ac-

cident. He either left Missouri at 4:30 a.m., 6:30 a.m., or noon. He arrived in Kansas City at 11:30 a.m., 12:30, or 4:30 p.m. He arrived at the residence where he delivered furniture at either 12:30 or 3:00 p.m., and he arrived at Olathe at either 2:00 p.m., 5:00 p.m., or 6:00 p.m. He remained there for either three hours or one and one-half hours. Printup testified that he knew it was reckless and could lead to an accident if he worked 17-18 hours a day, yet his testimony supports a finding that he worked from 4:30 a.m. until midnight when the wreck occurred, give or take a few hours. Printup's testimony indicated wanton disregard for the safety regulations requiring limited work hours and accurate recordkeeping. To the extent that such disregard may be interpreted as related to the cause of the accident, it supports the claim that he acted wantonly.

Printup also testified that before the accident, his trailer began to fishtail, which he recognized as a sign that the road was slick and that he was losing control; yet, he did not reduce his speed. Under these circumstances, the court did not err in submitting this claim of wanton conduct to the jury.

## CONCLUSION

The judgment of the court is affirmed in the following particulars. K.S.A. 1992 Supp. 60-3701 is constitutional. Punitive damages are not available in a wrongful death action in Kansas. After the enactment of K.S.A. 1992 Supp. 60-3701 *et seq.*, a plaintiff has no right to advance a separate claim for punitive damages against an employer or principal based upon negligent acts of the employer or principal in hiring, supervising, training, or retaining the employee/agent.

The court's rulings regarding the admission of financial records to determine the amount of punitive damages are affirmed, and those rulings become the law of the case upon remand. Likewise, the court's rulings regarding the admission of evidence of remedial conduct together with evidence of settlement negotiations are affirmed and become the law of the case upon remand.

The court's holding that joint and several liability is not available under the provisions of K.S.A. 1992 Supp. 60-3701(b), (e), and (f) is affirmed. The court's holding that treble damages under K.S.A. 66-176 are unavailable in this case is affirmed and becomes

the law of the case upon remand. Finally, the court correctly determined that there was sufficient evidence to submit to the jury the plaintiffs' claim of conscious pain and suffering on behalf of Smith and the issue of wantonness of Printup's conduct.

The court erroneously excluded relevant evidence of authorization or ratification under the provisions of K.S.A. 1992 Supp. 60-3701(d)(1) that affected the substantial rights of the plaintiffs. The court also committed clear error by failing to instruct the jury on authorization under 60-3701(d)(1). Accordingly, the decision regarding punitive damages is reversed, and the case is remanded with the following directions:

(1) Upon remand, a jury will be required to determine, under the guidelines set forth in this opinion, whether punitive damages should be awarded against Southwest.

(2) The jury determination that punitive damages should be awarded against Red Ball and Printup is affirmed, and the jury shall not consider this issue.

(3) The court's determination of the amount of punitive damages against Red Ball and Printup is reversed.

(4) After a jury has determined whether Southwest shall be assessed punitive damages, the court may be required to determine the amount, if any, of punitive damages to be awarded against Southwest consistent with this opinion.

(5) The court will be required to determine the amount of punitive damages to be assessed against Red Ball and Printup consistent with this opinion.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with our opinion.

SIX, J., dissenting and concurring: I would affirm the trial court. My dissent addresses three issues identified by the issue numbers in the majority opinion: (4) the exclusion of evidence about American Red Ball Transit Company, Inc.'s, (Red Ball) operations before November 8, 1984; (5) exclusion of evidence of Southwest Movers, Inc.'s, (Southwest) recordkeeping practices; and (6) jury instructions on ratification or authorization. I concur in the majority's thoughtful analysis of the difficult constitutional questions and in the remaining issues.

## Exclusion of Evidence

A threshold observation is important. The jury found that punitive damages should be awarded against Red Ball in the sum of $100,000 and Printup for $20,000.

The conscious pain and suffering award to Barry L. Smith, the administrator of the estate of Glen C. Smith (the Administrator), was $1,000. The $1,000 actual damage award, which is the linchpin in the case at bar, was jointly and severally assessed against Printup, Red Ball, and Southwest.

The trial court entered judgment on the wrongful death claim in the amount of $199,881.85 for the plaintiffs Barry Smith, Lisa Smith, and Brian Smith as the heirs-at-law of Glen C. Smith. That judgment is not before us. Phillip D. Elliott, the heir at law of Carolyn Sue Elliott, recovered a judgment of $139,844.91 in his wrongful death action. No punitive damages claim arising from the death of Ms. Elliott is before us.

The majority, in negating the amounts, has affirmed the punitive exposure of Red Ball and Printup. On retrial, the pre-November 8, 1984, Red Ball evidence that was excluded will not go to the second jury. The only new evidence for the second jury will relate to Southwest's recordkeeping practices.

On September 15, 1987, the date of the accident, Printup, who was employed by Southwest, had been "leased out" to Red Ball for 4 to 5 years. Printup only drove for Red Ball. Red Ball dispatched him, and he turned in his shipping documents and driving logs to Red Ball. His expense receipts were turned in to Southwest for reimbursement. The expense receipts are not at issue.

The majority finds that the Administrator's substantial rights have been affected, and so the error was not harmless under K.S.A. 60-261, by: (1) the exclusion from the jury of the Southwest records, and (2) the exclusion of the pre-November 8, 1984, Red Ball records from consideration by the judge during the statutory punitive damages hearing. I do not agree.

Rulings on the admissibility of evidence fall within the sound discretion of the trial court. The Administrator, who objects to the trial court's ruling, must show abuse of discretion. Our standard of review on abuse of discretion instructs us that such abuse

exists only when no reasonable person would take the view adopted by the trial court. *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 740, 822 P.2d 617 (1991).

I find no abuse of discretion. The Red Ball limitation was imposed only on records of events occurring before November 8, 1984. The Administrator was entitled to introduce records covering a period of approximately three years before the accident. A relevancy ruling based on remoteness ordinarily rests in the discretion of the trial court. The abuse of discretion standard controls. *Tucker v. Lower*, 200 Kan. 1, 6, 434 P.2d 320 (1967). The trial judge explained the selection of the November date:

"THE COURT: . . . the date is a certain period of time giving, I think, it is two months, giving the company the chance to implement the changes made after the settlement with the federal agency.

"MR. FISHER [Plaintiff's Counsel]: So you are intending to exclude the fact that they were cited for safety defects by the federal government?

"THE COURT: Yes.

. . . .

"THE COURT: You are going to be able to show how they were functioning on that date [November 8, 1984] forward, and then you are going to be able to show how they were doing after that.

"MR. FISHER: Okay, that's fine."

The recordkeeping practices of Southwest were excluded. I cannot say that such exclusion was an abuse of discretion when Printup, for a period of 4 or 5 years before the accident, had been driving only for Red Ball. This is particularly true when the facts indicate that the relevant records, *e.g.*, the driving logs and shipping documents, were turned into Red Ball.

The majority finds that the trial court should be reversed on the evidence issues because "[t]here is evidence in the record from which the jury could infer that Printup was tired and fell asleep and lost control of the tractor-trailer."

The majority candidly observes that "[t]he accident investigation was not conclusive as to whether Printup fell asleep at the wheel. Patrolman Brent Joy was equivocal about whether driver fatigue was a factor." In fact, Officer Heryford testified that if Printup had performed like the normal sleeping driver, his truck would have gone off the right side of the road instead of crossing the median. However, I agree with the majority's statement: "[T]he jury was entitled to weigh this evidence as it saw fit."

The majority observes that "[t]he jury could have found that Printup's fatigue caused or contributed to the accident. The inconsistency of his testimony and his logs could support an inference that he was tired because he had worked more hours than he should have." My point is that records from Red Ball, the entity controlling Printup's over-the-road movement, for a period of approximately three years before the accident, provide a reasonable document source to demonstrate laxity and establish whether a fatigue factor was present on September 15, 1987. The post-November 8, 1984, period is adequate to establish, as of September 15, 1987, what Red Ball knew or should have known from log books, records of hours of service violations, and records of Printup's failure to comply with safety regulations. Because Southwest did not receive the log books, dispatch Printup, or process his shipping documents, I reason that the trial court ruling as to Southwest's records was not an abuse of discretion.

### Jury Instructions

My third area of disagreement relates to the majority's reversal based on the jury instructions. The majority holds that the trial court's failure to define authorization was clearly erroneous and that the instructions on ratification were defective. The majority reasons that the Administrator suffered no prejudice from the jury's determination that punitive damages should be awarded against Red Ball and Printup. Has not the majority grafted an anomaly onto its rationale? Red Ball was branded with punitive damages by the defective instructions used at trial. The ratification instruction, although defective as to Southwest, was, according to the majority, a proper instruction as to Red Ball.

On remand, a different jury, considering a different mix of evidence and receiving different instructions, will determine Southwest's punitive exposure. Red Ball will be on the sideline. Will the second jury be informed of the punitive awards against Printup and Red Ball? Could any aspect of the Southwest records forming the new evidence mix possibly relate positively to Red Ball on the authorization or ratification issue? A change in the multi-party formula resulting in bifurcation of the punitive liability determination also will change the chemistry of the remand litigation.

The majority opinion discusses "authorization and ratification," using reasoning from our agency law cases and punitive damage cases from other jurisdictions. The majority has informed the trial court that "[i]nstructions upon remand should be consistent with this opinion." The trial court is left to refashion the correct authorization and ratification instruction when the case returns for retrial. Red Ball also appealed on the ratification instruction issue. The punitive damages award against Red Ball resulted from two instructions and a single special interrogatory response by the jury on the verdict form. Red Ball objected to all three. Red Ball contends that the instant case involved a one-time tort; consequently, the Administrator must show Red Ball did something after the accident to signal that Printup's behavior was acceptable.

I also express concern as to the analysis of "authorized or ratified" under K.S.A. 1992 Supp. 60-3701(d)(l). The majority finds the failure to give an authorization instruction clearly erroneous. The majority acknowledges that "[m]any of the cases we have read and discussed in this opinion speak of ratification and authorization together, but they all suggest that if corporate management obviously tolerates the kind of conduct that causes the injury, it amounts to ratification and/or authorization." In the majority's analysis, the terms "authorization" and "ratification" are linked together. Query: What distinction between the two has been identified by the majority?

The trial court defined ratification to mean, "the acceptance of a course of conduct or act with an intent to ratify, and with full knowledge of all the material circumstances." The "full knowledge" phrase appears to be objectionable to the majority. I disagree. Punitive damages, because of their penal nature, are not favored in the law. Courts must be cautious in seeing that they are not improperly or unwisely awarded. *Commercial Credit Equipment Corp. v. Stamps*, 920 F.2d 1361, 1370 (7th Cir. 1990).

*Commercial Credit* is cited and distinguished in the majority's view. In *Commercial Credit*, the employer did not have actual knowledge of the employee's wrongful act. The majority indicates that the punitive damages cases from other jurisdictions are distinguishable because in those cases there were facts that should have put the employer on notice that the employee was engaged in misconduct. I find difficulty in understanding how the punitive

damages cases from other jurisdictions cited by the majority support the majority's conclusion that authorization of ratification may be implied. Knowledge is a key aspect of virtually all of the punitive damages cases cited by the majority. For example, in *Shout v. Black Clawson Co.*, 689 F. Supp. 774, 783 (S.D. Ohio 1988), the court stated, "We further concluded that certain of the defendant's high-level managers knew or should have known that Lewis was wrongfully withholding plaintiff's annual performance evaluations and salary reviews." In *Brink's Inc. v. City of New York*, 546 F. Supp. 403, 412 (S.D.N.Y. 1982), the court observed that "[t]he jury could reasonably have found that over a substantial period Brink's' senior management officials, with knowledge of repeated illicit activities and violations of company rules by a number of employees, failed to take appropriate investigative measures in an effort to apprehend and discharge dishonest employees." See also *Khalid Bin Talal Etc. v. E. F. Hutton & Co.*, 720 F. Supp. 671, 683 (N.D. Ill. 1989) (Hutton was aware of illegal securities trading and "allowed [the] trading to continue." "This activity more than suffices to constitute authorization of the doing and manner of the act, as well as ratification and approval thereof."); *Hart v. National Mortgage & Land Co.*, 189 Cal. App. 3d 1420, Syl. ¶ 7, 235 Cal. Rptr. 68 (1987) (Plaintiff alleged his superiors were aware that other employees were harassing him. "The court should have permitted the employee to amend his pleadings to allege that his superiors' knowledge and failure to act constituted ratification by the employer, or alternatively, that the coworker was an 'officer, director or managing agent,' which also constituted ratification under the statute."); *Hartman v. Shell Oil Co.*, 68 Cal. App. 3d 240, 250, 137 Cal. Rptr. 244 (1977) ("The bringing of an action or the basing of a defense on an unauthorized act with knowledge of the material facts is, at a minimum, some evidence of ratification.)"; *Wirig v. Kinney Shoe Corp.*, 448 N.W.2d 526, 534 (Minn. App. 1989), *aff'd in part, rev'd in part on other grounds* 461 N.W.2d 374 (Minn. 1990) (The court found that there was evidence of the principal's approval of the alleged misconduct.).

I favor a "knew or should have known" element in the definition of authorization or ratification under K.S.A. 1992 Supp. 60-3702(d)(l). Definitional reasoning arising from nonpunitive tradi-

tional agency cases should be applied with caution in a K.S.A. 1992 Supp. 60-3701(d)(1) punitive damages case. We have before us a first impression case. The majority could assist the bench and bar by drafting a specific instruction on "authorization or ratification" and thus share this court's view of the proper language to be used in a future punitive damages case.

The trial in the case at bar was lengthy. It began on July 9, 1991, and ended on July 31, 1991. The record consists of 25 separate volumes. The case was tried before an experienced trial judge. The parties were represented by experienced counsel. We received an *amicus* brief from the Kansas Trial Lawyers Association. In my view, although the parties may not have received a perfect trial, they received a fair one. They cannot ask for more. See *Leiker v. Gafford*, 245 Kan. 325, 366, 778 P.2d 823 (1989). The failure to instruct on authorization was error. I find in reviewing the record that substantial justice was done under the totality of the circumstances. Any instruction developed with hindsight from within the definitional perimeters of the majority's discussion on "authorization and ratification" would not have altered the result (particularly considering the majority's acknowledged sameness linkage of "authorization" and "ratification"). The instruction omission was not reversible or prejudicial error. See *Lucas v. Pearce*, 223 Kan. 749, 753, 576 P.2d 670 (1978) (failure to give an issue instruction in a medical malpractice case). I conclude that any error that may have occurred was harmless. See K.S.A. 60-261 and K.S.A. 60-2105.

HOLMES, C.J., and McFARLAND, J., join in the foregoing concurring and dissenting opinion.